[No. S081148. Aug. 12, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN CARL JENNINGS, Defendant and Appellant..

620

624

## COUNSEL

Gregory Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEORGE, C. J.**—A San Bernardino County jury found defendant Martin Carl Jennings guilty of the first degree murder of his five-year-old son, Arthur Jennings. (Pen. Code, § 187.)[1] The jury further found true the special circumstance that the murder was intentional and involved the infliction of torture (§ 190.2, subd (a)(18)), but found not true the special circumstance that defendant intentionally killed Arthur by the administration of poison (§ 190.2, subd. (a)(19)). Following the penalty phase of the trial, the jury returned a verdict of death. After denying defendant's motion for a new trial and his application for modification of the judgment (§ 190.4, subd. (e)), the trial court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase Evidence*

#### 1. *The prosecution's case*

##### (a) *The torture and murder of Arthur Jennings*

Defendant was tried together with his wife, Michelle Jennings.[2] Defendant and Michelle had been together since Michelle ran away from home in 1989, when she was 14 years of age and defendant was 29. Arthur Jennings was born prematurely to defendant and Michelle on November 16, 1990. Shortly after Arthur's birth, defendant and Michelle placed Arthur in the care of defendant's mother, who soon thereafter became terminally ill. Subsequently, defendant's half sister, Wilma S., who resided in Montana, began caring for Arthur when he was four months old. Although Arthur had several medical problems when he was born, most seemed resolved by the time he was five years of age.

In early November 1995, defendant telephoned Wilma to tell her that he wanted Arthur back. He informed Wilma that the couple had a newborn

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

[2] The jury found codefendant Michelle Jennings guilty of first degree murder, found not true the murder-by-poisoning special circumstance, but was unable to reach a verdict on the torture-murder special circumstance. The trial court declared a mistrial with regard to the latter special circumstance alleged as to Michelle, and later retried that matter without a jury based upon the transcript of the proceedings at the first trial. On retrial, the court found the torture-murder special circumstance not true, concluding that Michelle did not possess the requisite intent to kill. (See *People v. Jennings* (2003) 112 Cal.App.4th 459, 470–471 [5 Cal.Rptr.3d 243] (*Jennings*).) Michelle Jennings ultimately was sentenced to state prison for a term of 25 years to life. Her conviction and sentence were affirmed on appeal. (*Id.* at p. 462.)

daughter, Pearl, that he had obtained employment, that the family had moved into a trailer near Apple Valley adjacent to the Mojave Desert, and that he and Michelle were prepared to raise the children together.

Defendant paid for Wilma and Arthur to travel by bus from Montana to California. During Wilma's 10-day visit, she warned defendant that Arthur wet the bed, was afraid of the dark, and could be difficult when he did not get his way. Wilma additionally told defendant and Michelle that she would take Arthur back if he proved to be too much of a problem, but she never heard from them again.

When Wilma left to return to Montana, Arthur weighed approximately 64 pounds. He was happy and in good health. Within a few weeks, however, defendant and Michelle began to abuse Arthur. During late 1995 and early 1996, a number of neighbors noticed signs of abuse.

Approximately two weeks before Christmas in 1995, Phillip and Kevin Orand visited the Jenningses' home. Phillip saw Arthur with two black eyes and a mark on his mouth. Arthur was making an odd sound, rocking back and forth but staring straight ahead. When Phillip inquired what was wrong with Arthur, defendant said Michelle had "knocked him out." Michelle confirmed to Kevin that she had "socked the damn little brat between the eyes, knocked him out."

On Christmas day in December 1995, Louis Blackwood went to the Jenningses' residence for dinner. Blackwood saw Arthur eat two full plates of food and ask for a third, only to be reprimanded. Blackwood also noticed that Arthur's hand was bandaged. When he asked what had happened to Arthur's hand, Blackwood was told that Arthur had burned himself by touching the wood stove. On a separate occasion about two weeks later, Blackwood saw Arthur with a bruise on the side of his face from the hairline down to the jaw line, which Blackwood described as "not a normal injury." Michelle told Blackwood that Arthur had fallen. Blackwood described Arthur as looking "whipped" and unhappy. In February 1996, a few days before the police started searching for Arthur, defendant told Blackwood that Arthur had gone missing in the middle of the night and that he and Michelle had spent three hours looking for Arthur before they finally found him hiding behind a bush in the desert.

Bernard Romaine saw Arthur in early January 1996 and recounted that he looked "pretty beat up." At the time, Arthur had two black eyes—one in particular that was "real bad" and appeared to require medical attention because it was swollen shut and seeping blood—and a bandaged hand that appeared to have been burned. Arthur also appeared very thin and undernourished.

Pauline Morris, an acquaintance of the Jenningses', saw Arthur in early January 1996. Arthur had bandages on his head and hands, dried blood on his face, and blood in the whites of his eyes. Defendant's father, Art, Sr., told Morris that Arthur was injured when he fell against a wood stove. According to Morris, Arthur was very thin and, when offered milk, "swigged it down." Morris made a report to child protective services (CPS), but CPS apparently did not follow up on the complaint.

On January 5, 1996, Michelle telephoned CPS to report that her neighbors were abusing their 18-month-old son. During a subsequent telephone conversation on January 8, Michelle asked the CPS worker, Betty Hocking, if Hocking could find an adoptive home for Arthur. Michelle told Hocking that Arthur had been with them for two months and that she could not manage him. Hocking asked whether Michelle could return Arthur to the relative with whom he previously resided. Michelle responded that was not an option. Hocking then suggested parenting classes and therapy. As a last resort, she gave Michelle an adoption worker's telephone number. On January 15, the Jenningses went to Hocking's office to speak with her in person about the neighbors' situation. With them was Arthur's baby sister, Pearl, who appeared to be well taken care of and happy. At the end of the conversation, Michelle said, "I wish there was something we could do with our son," and again inquired whether Hocking might have an adoptive home for Arthur. The Jenningses explained that they could not control Arthur and that they had many concerns about his behavior. Hocking again suggested parenting classes and therapy and gave them the adoption worker's phone number. Before leaving, Michelle inquired whether anyone had reported the Jenningses to CPS. When asked why anyone would report them, Michelle claimed she was worried about possible allegations by jealous neighbors.

On February 4, 1996, while Michelle was away, Cora Grein, a neighbor, visited the Jenningses' home. Defendant and Arthur were watching a television program, and Grein joined them. Defendant instructed Arthur to go to his bedroom. Defendant then attempted to kiss Grein, but she resisted. During this attempt, Arthur reentered the room and subsequently was instructed by defendant to return to his bedroom. Grein testified that as Arthur began walking away, defendant grabbed him and struck him on the back of his head with a fireplace shovel. Defendant then picked up Arthur and threw him on the bed. He told Grein that if she said anything she would "see the bottom of a mine shaft." Grein told defendant she would remain quiet, and left.[3]

---

[3] When asked whether she had ever previously witnessed either of the Jenningses strike Arthur, Grein recounted an incident in which defendant had Arthur stand in the front yard of their house holding a wooden beam over his head and then struck Arthur when he dropped it.

Arthur died within an hour of being struck on the head with the shovel. The Jenningses initially buried Arthur's body in a shallow grave inside an old chicken coop. A few hours later, however, they unearthed Arthur's body and threw it down a nearby desert mine shaft. The Jenningses then attempted to scrub the blood off Arthur's bedroom walls. Defendant also burned Arthur's sheets and the gloves used to bury him, and placed Arthur's diaper, clothes, and glasses in the trash.

### (b) *The sheriff's investigation*

On February 6, 1996, two days after Arthur's death, the Jenningses reported Arthur missing to the San Bernardino County Sheriff's station. Defendant stated that he last saw Arthur in his bed at about 2:00 a.m., and noticed he was missing at 6:00 a.m. Michelle said she last saw Arthur about 10:30 p.m. Both defendant and Michelle claimed they tried to find Arthur but were unable to locate him. A search subsequently was initiated by law enforcement officers.

When the search party was unable to find Arthur or any indication of recent activity by Arthur, the authorities began to treat the case as a homicide and summoned the Jenningses for questioning. In separate interviews, defendant and Michelle admitted that Arthur had been dead since February 4. They also independently led officers to the mine shaft in the desert where Arthur's unclothed body was found wrapped in a blanket.

On February 8, 1996, detectives conducted a joint interview of defendant and Michelle, in which the Jenningses detailed their abuse of Arthur.[4] Defendant acknowledged that at various times he pushed, elbowed, kicked, shook, and hit Arthur. After initially blaming Michelle and then Grein, defendant eventually admitted striking Arthur on the back of his head with the fireplace shovel on the day he died. Defendant did state, however, that he did not want Arthur to die. Nevertheless, when later asked whether he ever had attempted to suffocate Arthur, defendant responded, "I don't know, maybe."

During the interview, the detectives posed questions regarding incidents that had occurred prior to Arthur's death. Defendant acknowledged he and Michelle had discussed "killing" and "getting rid of" Arthur. Michelle said defendant wanted to shoot Arthur in the head, but she suggested returning him to Wilma or giving him to Art, Sr. Defendant admitted that two days prior to Arthur's death, he and Michelle drove around the desert looking for a place to "dump the body."

---

[4] At trial, two videotapes and an audiotape of the joint interview were played to the jury. Each juror also was given a copy of a transcript of the interview.

Detectives also confronted defendant with a statement, made by defendant to Michelle, declaring that they did not need to list Arthur on their insurance policy because Arthur "wouldn't be in the house long enough to need it." Defendant claimed he "had a change of heart about killing [Arthur]" and that his statement had referred to the idea of returning Arthur to Wilma.

The Jenningses also admitted giving Arthur the drug Unisom, an over-the-counter sleep aid, as well as Vicodin and Valium, both prescription painkillers that had been prescribed to defendant for a work-related injury. Michelle admitted that on the day Arthur died, she gave him one Vicodin and two sleeping pills at defendant's behest, but claimed any other pills were given to Arthur by defendant. A detective asked defendant, "Did you tell her to give [Arthur] medication, that it would help him?" Defendant responded, "Yeah. I honestly thought it would. We was trying to get him better and he died." Although acknowledging that Vicodin and Valium made defendant feel "sleepy" and "numb" and claiming that he cut the pills in halves or in quarters before giving them to Arthur, when defendant was asked what he thought the pills would do to "a five-year old that weigh[ed] 35, 40 pounds," defendant maintained he "didn't think about it."

At one point during the interview, defendant acknowledged he was going "to have to pay" for what had happened to Arthur. Defendant admitted he knew he "had to finish [Arthur] off" once Arthur saw him kissing Cora Grein. When the detectives questioned who killed Arthur, defendant stated, "I probably did" by "abusing him and the medication and stuff." Nevertheless, defendant claimed he "did not mean to actually kill Arthur" and tried to save Arthur's life by administering cardiopulmonary resuscitation (CPR) to him.

Following defendant's and Michelle's arrests, officers searched their home and found, among other items, a loaded .32-caliber pistol; a fireplace shovel; a box of Unisom; and bottles of the prescription medications carisoprodol, Darvocet, Vicodin, and Valium, as well as prescription-strength ibuprofen. In the course of his testimony, a detective involved in the search showed the jury photographs of the many perishable and nonperishable food items observed in defendant's home, and of the bloodstains found in Arthur's bedroom. A criminologist testified that the blood spatter patterns found in 12 areas of the bedroom came from several separate events—most the result of medium-energy impact and a few from low-energy incidents and smearing.

(c) *The autopsy*

Dr. Frank Sheridan, a forensic pathologist, performed the autopsy on Arthur's body. Dr. Sheridan testified that at the time of his death, Arthur was 3 feet 10 inches tall, and weighed only 35 pounds. His body as a whole was "severely emaciated and malnourished"; he had almost no body fat or fatty tissue, his muscles were wasted, and he had no food in his stomach when he died.[5] Dr. Sheridan's examination of Arthur revealed no medical reason why Arthur would not have been eating or gaining weight. The severity of Arthur's condition indicated it was not something that had occurred over a short period of time.

Dr. Sheridan also testified concerning Arthur's numerous physical injuries, which he described as "generally painful to varying degrees" and as having required force to inflict. Visible injuries to Arthur's body included a bruise and an abrasion on the tip of Arthur's nose, bruising and a laceration in the area between the nose and the upper lip, bruises on the inside of his lips and gums, a lacerated oral frenulum (between the gum and the upper lip), and a slight bruise on the tip of his tongue. These injuries occurred shortly before death and were most consistent with smothering.

Arthur also had two injuries to the back of his head—one injury on the right side that was a few weeks old and had been sutured,[6] and a second "fresh" injury on the left side that had occurred no more than six hours prior to his death, and possibly as recently as immediately preceding the time of death, but that was not itself life threatening. The remainder of Arthur's external injuries included a severe burn on his right hand, covering half of the palm and most of the fingers, that probably was several weeks old; abrasions on his left hand and arm, right elbow, and left buttock; "rug burn" abrasions and bruising on his left back; bruises on his chest, shoulders, right elbow and arm, left arm, and left buttock; a major hemorrhage to the right shoulder blade area; and a scar on the back of his lower right thigh.

An internal examination revealed extensive hemorrhaging to the deeper layers of Arthur's scalp that extended across the entire front of his forehead, indicating some kind of blow or impact to the area. This injury occurred shortly before Arthur's death but separately from his other recent head injury.

---

[5] Dr. Sheridan explained that a healthy person normally stores a layer of subcutaneous fat beneath the skin and that Arthur "had essentially none, or extremely little." He defined "wasting" as the process of a starving person's body breaking down muscle for energy after the body fat has been depleted. He further explained that it normally takes a person's stomach "a period of hours" after eating to be emptied of food.

[6] Defendant admitted in the joint interview with the detectives that he personally had sutured a cut on Arthur's head.

Arthur also had a subdural hemorrhage on the left side of his head that was at least 10 days old, and hemorrhaging around the optic nerves of the back of the eyes from the same injuring event. Dr. Sheridan referred to this as an "acceleration/deceleration injury" consistent with a child who had been shaken violently, possibly causing permanent brain damage.[7]

A microscopic examination of Arthur's lung tissue indicated he had acute pneumonia at the time of his death. Dr. Sheridan attributed this infection to the breakdown of Arthur's immune system and his overall failure to thrive.

Toxicology tests revealed that Arthur had three drugs in his blood system, all central nervous system depressants. The first drug was a significant amount of Unisom consistent with the administration of two sleeping pills. The dose was sufficient to cause seizures and cessation of breathing. The second drug was a small amount of Vicodin, a prescription painkiller, which would have added to the sedative or depressive effect of the Unisom. The third drug was a small amount of Valium, which would have played a minor contributing role in Arthur's condition.

When asked whether he had determined "a cause of death or causes of death," Dr. Sheridan replied, "Causes." On the death certificate, he listed the "main cause of death" as "combined drug toxicity," because although the level of Unisom alone was potentially fatal and the levels of Vicodin and Valium alone were not toxic, the three drugs together had a certain "additive effect" on sedation. Under the heading "Contributing Causes"—which Dr. Sheridan explained is "where you can list something else that contributed to death but is separate from the main one"—he listed "acute and chronic physical abuse and neglect." The term "acute" referred to Arthur's injuries inflicted shortly before death, and the term "chronic" referred to Arthur's older injuries as well as to the "very, very severe" emaciation and malnutrition. Also listed as a contributing cause was the acute pneumonia, which was a complication of Arthur's emaciated state.

Questioned further, Dr. Sheridan gave the cause of death as "the entire problem"—the drugs, the physical injuries, and the malnutrition and emaciation—"all working together," that brought about the resulting death. He described Arthur as in a "downhill slide" and "very near to the end of his life" because of malnutrition and "the whole body not functioning properly." Dr. Sheridan testified that even without the ingestion of drugs, Arthur likely would have died within a fairly short period of time if he were

---

[7] Dr. Sheridan explained that in the case of an infant, it requires "quite a bit of violence" to produce the amount of injury Arthur had suffered and that with regard to a child who is five years of age, "it would take a little bit more" because they would have good control of their neck and the neck muscles would resist the backward and forward motion of the head.

not given medical attention and food. Without the positive toxicology results, Dr. Sheridan would have concluded that acute abuse was the primary cause of death, most likely by smothering.

#### (d) *Stipulation regarding expert toxicologist*

The parties entered into a stipulation concerning the testimony of Dr. Randall C. Baselt, a toxicologist, which was read into the record. According to the stipulation, if called as a witness Baselt would have testified that the drug concentrations found in the autopsy blood specimen of five-year-old, 35-pound Arthur Jennings, "when taken at face value, were sufficient to account for [his] death." The Unisom "played the most important role in this drug combination, and, in fact, could have caused death in the absence of the other two agents." He noted, however, that without analyzing other autopsy specimens, such as liver, brain, urine or stomach contents, "it would be difficult for a forensic toxicologist to offer any definitive opinions as to the timing of the drug administration, the size of the dose or doses and the exact role that the [Unisom] played in the death."

### 2. *The defense's case*

Neither defendant nor Michelle testified at trial. Defendant called Dr. Joseph Lantz, a licensed clinical psychologist, who testified concerning the results of tests he administered to determine defendant's cognitive ability, intelligence, and personality profile. Lantz opined that defendant possessed limited intelligence, was severely impaired in his problem-solving ability, had a personality disorder consisting of narcissism and antisocial behavior, and had been abused by his parents. Lantz further explained that a person who is severely abused as a child is much more at risk as an adult to perpetuate a pattern of abuse. He concluded that defendant was angry, hostile, explosive, impulsive, and difficult to deal with.

Additionally, Lantz noted that defendant's personality problems increased when he lost his job due to a back and shoulder injury. Defendant was in pain, not working, and short of money. When defendant was employed, he was a regular methamphetamine user, but later quit. As Lantz explained, those who quit use of that drug "generally go through a period of agitation." Defendant stopped using methamphetamine when he developed nausea due to the interaction between the methamphetamine and his prescription medications.

Lantz further testified that the Jenningses had no concept of how to deal with Arthur's needs. He also opined that Arthur's behavior had deteriorated to that of a child of lesser age after he was returned to his parents' care, and that the Jenningses responded by reverting to the disciplinary techniques that had

been used upon them. Lantz concluded, however, "that things had gone so far out of line that even [defendant] and Michelle could understand that . . . they needed to do something to help the child." Lantz believed the Jenningses gave Arthur pills to "provide some mercy to the child." In Lantz's opinion, in light of the circumstance that "[the Jenningses] were not holding back" when they abused Arthur, defendant demonstrated some restraint by administering only two pills to Arthur. He acknowledged, however, that defendant lacked empathy and that neither defendant nor Michelle seemed to care about Arthur's death.

Michelle called Dr. Nancy Kaser-Boyd, a licensed clinical psychologist, who testified concerning her testing and evaluation of Michelle. The psychologist related Michelle's history of rape and abuse by her father (resulting in pregnancy and an abortion), betrayal by an older sister and her mother, molestation by a teacher, and abuse by defendant. Kaser-Boyd stated that Michelle was fearful, depressed, and lacked insight, was socially isolated and felt helpless, had difficulty controlling her impulses, had a dependent and schizophrenic personality, and possessed an IQ in the bottom fifth percentile. Kaser-Boyd explained that the characteristics displayed by Michelle are typical of abused and battered women.

Kaser-Boyd further testified that Michelle did not understand Arthur's seizures—which defendant told her were temper tantrums but Kaser-Boyd, based on her own experience and training, viewed as epileptic—and that Michelle's response to the seizures was to slap Arthur. Kaser-Boyd explained that Michelle wanted to obtain medical care for Arthur, but did not do so because he had bruises and she was afraid of losing custody of her baby, Pearl. Michelle also told Kaser-Boyd that defendant suggested withholding food from Arthur because hitting him "was not working," and that Michelle went along with defendant's plan, but sometimes would sneak food to Arthur.

An adoption social worker, Margret Thomas, testified regarding a telephone call she received on January 18, 1996, from Michelle discussing adoption options for Arthur. During the call, Michelle said Arthur was recently returned to her home, but she was unable to handle him and therefore was considering placing him for adoption. By the end of the conversation, Michelle agreed to consider returning Arthur to Wilma, the paternal aunt with whom he had resided in Montana before being returned to the Jenningses. Michelle never followed up with Thomas.

### 3. *The prosecution's rebuttal*

Sheriff's investigator Kathleen Cardwell interviewed Michelle on February 6, 1996, and asked her about her relationship with defendant. Michelle

responded that she had an excellent relationship with him, stating they got along fine and defendant treated her well. When Cardwell inquired whether defendant ever physically abused her, Michelle said he hit her when they first married. She had threatened to leave him, and since 1990 he never struck or mistreated her again. Cardwell did not notice any visible injuries on Michelle.

### B. Penalty Phase Evidence

#### 1. The defense's case[8]

Dr. Geraldine Stahly, a social psychologist, testified concerning the history of defendant's family. Most of defendant's relatives suffered from mental illness and low intelligence, many had criminal histories, and two half brothers were in prison for murder, one on death row. Defendant's mother, Pearl Jennings, was reported to have suffered from heroin addiction and at some point to have been placed in a mental hospital for schizophrenia. She had 11 children with her first husband, Raymond Foster. The Foster children were sexually abused by their father and physically abused by both parents. Later, however, the Foster sons came to idealize their father because they "remembered him as not being so bad."

The Foster children also were sexually molested and physically abused by their mother's second husband, Art, Sr., who was defendant's biological father. Art, Sr., allegedly killed Helen, one of the Foster children, by smothering her with a pillow when she was five years of age. In 1957, after approximately two years together, the Foster children, as well as Pearl and Art's newborn baby, were taken from them by the state. The baby was adopted, and the other children were placed in foster homes and orphanages.

Defendant was born in 1960. He was much younger than the Foster children and was raised as if he were an only child. At that time, the economic circumstances of the Jennings family had improved considerably. Art, Sr., once forced defendant to steal but subsequently did not press him to engage in such activity again, because defendant proved to be an inept thief. The Foster children perceived that defendant was "spoiled" and "had it good." But defendant reported to Stahly that his mother forced him to orally copulate her when defendant was nine years of age and demanded during the ensuing year that he perform this act a couple of times a week. He also told Stahly that before attaining the age of 13 years, he was forced to orally copulate Art's girlfriend. Both parents also physically abused defendant, although apparently not to the extent they abused the Foster children.

---

[8] During the penalty phase of the trial, defendant presented his evidence and arguments prior to the prosecution's.

In Stahly's opinion, defendant and his siblings suffered not only from sexual and physical abuse, but also from emotional and "moral" abuse. Stahly discussed various factors that placed Arthur at risk for being abused when he was returned to defendant's care. She stated that violence was defendant's way of coping with stress and that he "never saw any other coping style." According to Stahly, individuals are "children of [their] parents" and parents will shape the lives of their children absent outside intervention, which did not occur in defendant's case. Stahly also acknowledged, however, that if victims are able to recognize that their experiences and patterns of behavior are abnormal, they can end the cycle of abuse as they mature.

Joseph Lantz, the psychologist who testified on defendant's behalf at the guilt phase of the trial, testified again at the penalty phase. In Lantz's opinion, defendant was seriously affected by the environment in which he was raised. Lantz agreed with Stahly's testimony, adding that there would have to be "very active intervention both with the child and with the family" for someone who had been seriously damaged by abuse as a child "to turn their life around." Lantz stated that social isolation, coupled with severe and ongoing physical, emotional, and sexual abuse and neglect, left defendant "to drift" without normal development.

Lantz referred to an incident in which defendant's arm was broken when his father attacked him with a baseball bat, and another event when defendant was shot during a hunting accident and his father tied him down at home while removing the bullet fragments. Lantz also testified that defendant was incapable of deciding to take Arthur's life and did not intend to kill Arthur.

James Park, a retired employee of the California Department of Corrections, testified regarding the situation defendant would encounter if sentenced to life imprisonment without the possibility of parole. In Park's opinion, defendant was unlikely to be a danger to anyone inside the prison.

### 2. The prosecution's case

The prosecution presented one rebuttal witness, defendant's half sister, F.E., who testified that she was sexually and physically abused by her father, Raymond Foster. Her mother Pearl, whom F.E. described as cold and distant, was not abusive, although Pearl knew about the abuse and did nothing to stop it.

F.E. ran away and in 1954 was placed in a home for girls. Nevertheless, F.E. saw Pearl and Art, Sr., on various occasions. In 1960, F.E. visited her mother, who was pregnant with defendant, but left after Art, Sr., beat and raped her. She again visited her mother and Art for approximately six weeks

in 1971, when defendant was 10 or 11 years of age. On that occasion, she observed that Pearl adored defendant and Art was very good to him. Beginning in 1973, F.E. saw the family regularly and observed normal parent-child relationships between defendant and his parents.

Wilma S., defendant's half sister who raised Arthur until he was five years of age, testified again at the penalty phase as a victim-impact witness. Wilma explained that she was given custody of Arthur when he was four and a half months old and that she loved him very much. She had not wanted to return Arthur to defendant and Michelle, but when she sought legal advice, she was told she could not keep him. Wilma further testified that although Art, Sr., sexually molested her and physically abused her and all of her siblings, her mother did not beat her.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Sufficiency of the evidence*

Defendant contends that the evidence presented at the guilt phase was insufficient to establish first degree murder or the torture-murder special circumstance. He further asserts that basing a conviction or special circumstance finding on the insufficient evidence presented at his trial violated the "narrowing" principle of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and his right to due process of law under the Fifth and Fourteenth Amendments.

The law governing sufficiency-of-the-evidence challenges is well established and applies both to convictions and special circumstance findings. (*People v. Valdez* (2006) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296]; *People v. Elliot* (2005) 37 Cal.4th 453, 466 [35 Cal.Rptr.3d 759, 122 P.3d 968] (*Elliot*).) In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. (*People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388].) We neither reweigh the evidence nor reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) We presume in support of the judgment the existence of every fact the

jury reasonably could deduce from the evidence. (*Ibid.*) If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid.*)

■ In the present case, the trial court instructed the jury concerning three alternative theories of first degree murder advanced by the prosecution—murder by poison, murder by torture, and premeditated murder—and the verdict does not specify which theory the jury relied upon in finding defendant guilty. "A jury may convict a defendant of first degree murder, however, without making a unanimous choice of one or more of several theories proposed by the prosecution . . . ." (*People v. Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311].) As we explain below, the record discloses sufficient evidence to support the jury's finding that defendant was guilty of first degree murder on each of these three theories. There also is sufficient evidence to support the torture-murder special-circumstance finding. Because defendant's corresponding constitutional claims rely upon the alleged insufficiency of the evidence and related arguments that we reject, they necessarily must fail as well.

(a) *Sufficiency of the evidence to establish first degree murder by poison*

Defendant contends he could not have been convicted of first degree murder by poison, because the jury found the poison-murder special circumstance "not true," and because Michelle, not defendant, administered "the fatal poison" and there is "no evidence" she intended to kill Arthur. We disagree. Reviewing the record in the light most favorable to the judgment, there is ample evidence to support defendant's first degree murder conviction on the basis of murder by poison.

■ As we previously have noted, "it is not the case that the elements of the murder-by-poison special circumstance merely repeat the elements that render a homicide a first degree murder when committed by means of poison." (*People v. Catlin* (2001) 26 Cal.4th 81, 158 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*); see § 189 ["All murder which is perpetrated by means of . . . poison . . . is murder of the first degree."]; § 190.2, subd. (a)(19) [defining the poison-murder special circumstance as a first degree murder in which "[t]he defendant intentionally killed the victim by the administration of poison"].) "The special circumstance allegation, unlike the definition of first degree murder by poison, requires proof that the defendant intentionally killed the victim. For the purpose of a first degree murder conviction based upon an unlawful killing by means of poison, proof of implied malice would suffice . . . ." (*Catlin, supra*, 26 Cal.4th at p. 158.) Therefore, even if we were

to assume the jury rejected the murder-by-poison special circumstance because it was not persuaded beyond a reasonable doubt that either defendant or Michelle intended to kill Arthur by means of the drugs, the jury still could have reasonably found defendant guilty of first degree murder by poison if it found that either codefendant acted with implied malice. (*People v. Diaz* (1992) 3 Cal.4th 495, 568 [11 Cal.Rptr.2d 353, 834 P.2d 1171] ["A defendant acting with implied malice who kills his or her victim with poison is guilty of first degree murder even if the defendant lacks the intent to kill."].)

The trial court instructed the jury pursuant to CALJIC No. 8.11 concerning implied malice, as follows: "Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

■ Defendant does not dispute that the natural consequences of administering three powerful sedatives to a five-year-old child are dangerous to human life, or that furnishing the drugs to Arthur was a cause of his death. The only issue in terms of implied malice, therefore, is whether there was sufficient evidence for a reasonably jury to have found that defendant " 'had full knowledge that his conduct endangered the life of decedent, but that he nevertheless deliberately administered the poison with conscious disregard for that life.' [Citation.]" (*People v. Blair* (2005) 36 Cal.4th 686, 745 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

The evidence presented at trial reasonably established the following sequence of events. On the morning of February 4, 1996, defendant directed Michelle to go to the store to purchase over-the-counter sleeping pills to give to Arthur.[9] When she returned, Michelle gave Arthur two Unisom sleeping pills, as well as one Valium, at defendant's direction. Defendant gave Arthur additional pain pills, which included Vicodin. Arthur died later that day as a result of combined drug toxicity and acute and chronic abuse and neglect.

---

[9] The transcript of the joint interview of defendant and Michelle quotes Michelle as stating: "Martin had to go to the store and get some Sominex to put [Arthur] to sleep." The People contend, and defendant does not dispute, that Michelle in fact stated, "Martin had *me* go to the store . . . ." The court has reviewed the videotape exhibit of the joint interview that was played for the jury, and it supports the People's contention. That it was Michelle, and not defendant, who went to the store and bought the sleeping pills, furthermore, is consistent with the testimony of the detective who conducted the separate interview of Michelle. Additionally, although Michelle refers to the Sominex brand of sleeping pills in the interview, other evidence presented during the trial established that the pills actually were the Unisom brand.

A box of Unisom sleeping pills in child-resistant packaging found at defendant's home was entered into evidence. In response to a juror question,[10] the instructions on the back of the package were read out loud by Dr. Sheridan. The instructions indicated that the proper adult dosage was one tablet daily and warned in pertinent part: "Do not take this product if presently taking any other drug without consulting your physician or pharmacist. . . . *For adults only. Do not give to children under age twelve years.* Keep this and all medications out of the reach of children." (Italics added.) Multiple child-proof containers of Vicodin and Valium that had been prescribed to defendant also were entered into evidence and shown to the jury.

In the joint interview, defendant altered his story several times and admitted lying to the detectives on numerous occasions. In evaluating the evidence pertaining to poisoning, the jury was not required to accept, and was entitled to reject, the claims that defendant administered the drugs to Arthur in an effort "to get him better," that defendant did not "know much" about the drugs, and that he "didn't think" about what effect the drugs would have on Arthur. To the contrary, the jury could have inferred exactly the opposite from defendant's remarks about killing Arthur, the acknowledgement that Vicodin and Valium made defendant feel "sleepy" and "numb," his claim that he halved or quartered the prescription pain pills before giving them to Arthur, and the admission by defendant that he "probably" killed Arthur by "[a]busing him and the medication and stuff like that." This evidence was sufficient for a reasonable jury to find that defendant deliberately administered the drugs to Arthur, and directed Michelle to do the same, with full knowledge that such conduct endangered Arthur's life and with conscious disregard for that life.

■ Defendant attempts to parse his involvement from Michelle's role in the administration of the drugs, ignoring the circumstance that he was charged and tried as an aider and abettor, as well as a direct perpetrator.[11] "Aider and abettor liability is premised on the combined acts of all the

---

[10] Juror No. 1371 submitted a question that read in relevant part: "I would be interested to know what were the dosage instructions printed on the Unisom box used by the Jenningses."

[11] The trial court instructed the jury pursuant to CALJIC No. 3.00 (principals defined), CALJIC No. 3.01 (aiding and abetting defined), and CALJIC 3.04 (compelling another to commit a crime), as follows: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is equally guilty. Principals include: [¶] (1) Those who directly and actively commit the act constituting the crime; or, [¶] (2) Those who aid and abet the commission of the crime. [¶] A person aids and abets the commission of a crime when he or she: (1) With knowledge of the unlawful purpose of the perpetrator and (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime and, (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does

principals, but on the aider and abettor's own mens rea. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator. [¶] Moreover, the dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120 [108 Cal.Rptr.2d 188, 24 P.3d 1210].)

The evidence described above was sufficient for a reasonable jury to have found that defendant poisoned Arthur, or that he aided and abetted Michelle in poisoning Arthur, or that both occurred. Therefore, even assuming for purposes of argument that the sleeping pills administered by Michelle were the sole cause of Arthur's death, and that the additional drugs and torture were not concurrent causes, a reasonable jury still could have found defendant guilty of first degree murder by poison as an aider and abettor. In any event, there is sufficient evidence to support defendant's conviction of first degree murder on the theory of murder by poison.

(b) *Sufficiency of the evidence to establish first degree murder by torture*

Defendant claims the evidence was insufficient to support his conviction of first degree murder on a murder-by-torture theory. (See § 189 ["All murder which is perpetrated by means of . . . torture . . . is murder of the first degree."].) He does not contend that the evidence of his physical abuse of Arthur—which included burning Arthur's hand on the stove, giving him black eyes, hitting him with a two-by-four, violently shaking and banging Arthur's head against the wall, kicking him in the midsection, duct-taping his mouth and hands, smothering him, and hitting Arthur in the back of the head with a fireplace shovel—was insufficient to establish torture. Rather, defendant contends that even assuming he tortured Arthur, there is insufficient evidence that his torture was the "but for" cause of Arthur's death, which defendant attributes to the drugs. We disagree. There was sufficient evidence presented at trial from which a reasonable juror could have found that defendant's acts of physical violence and deliberate starvation of Arthur were concurrent causes of Arthur's death.[12] As such, the evidence is sufficient to support a conviction of first degree murder by torture.

---

not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting. [¶] A person who by threat, menace, command or coercion compels another to commit any crime is guilty of that crime."

[12] The trial court instructed the jury pursuant to CALJIC No. 3.41 concerning concurrent causation, as follows: "There may be more than one cause of the death. When the conduct of

■ The elements of first degree murder by torture are: "(1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citations.]" (*People v. Cook* (2006) 39 Cal.4th 566, 602 [47 Cal.Rptr.3d 22, 139 P.3d 492].) The prosecution need not establish that the defendant intended to kill the victim (*ibid.*), but must prove a causal relationship between the torturous acts and the death (*People v. Chatman* (2006) 38 Cal.4th 344, 392 [42 Cal.Rptr.3d 621, 133 P.3d 534] (*Chatman*)). "The finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death. [Citations.] The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather, it is the continuum of sadistic violence that constitutes the torture." (*People v. Proctor* (1992) 4 Cal.4th 499, 530–531 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

■ If a defendant's acts of torture were a concurrent cause of the death, it is no defense that the conduct of some other person contributed to the death. " ' "When the conduct of two or more persons *contributes concurrently as the proximate cause of the death*, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 847 [111 Cal.Rptr.2d 129, 29 P.3d 209]; see also 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 37, p. 243 ["The defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause."].) "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583–584 [112 Cal.Rptr.2d 401].) "[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death." (*Catlin, supra*, 26 Cal.4th at p. 155.)

■ For this reason, defendant's focus upon "but for" causation, and whether the drugs were the "primary cause" of Arthur's death, is misplaced. "But for" or "sine qua non" causation provides that "[t]he defendant's conduct is a cause of the event if the event would not have occurred but for

---

two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death. [¶] If you find that the defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person contributed to the death."

that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." (Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 266, fn. omitted.)[13] By comparison, the "substantial factor" rule for concurrent causes "was developed primarily for cases in which application of the but-for rule would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the same result." (Prosser & Keeton, at p. 268.) As we have stated in the civil context, the tests for "but for" and "substantial factor" causation usually produce the same result, but the "substantial factor" standard states a clearer rule that subsumes and reaches beyond the "but for" test to more accurately address situations in which there are independent concurrent causes of an event. (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1415 [37 Cal.Rptr.2d 902]; see also *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239–1240 [135 Cal.Rptr.2d 629, 70 P.3d 1046].)

 In the present case, there was sufficient evidence from which a reasonable jury could have concluded that defendant's torture was at least a substantial factor in Arthur's death. Dr. Sheridan testified that the cause of Arthur's death was attributable to "*the entire problem*"—that it, the drugs, the physical injuries, and the malnutrition and emaciation—"*all working together*" to bring about the resulting death. (Italics added.) Additionally, the expert toxicologist and Dr. Sheridan both concluded that the dosage of Unisom that was administered to Arthur was sufficient to account for Arthur's death *in light of his age and weight*. The jury reasonably could have inferred from this evidence that defendant's physical abuse and purposeful starvation of Arthur contributed to the lethal effect of the pills, and therefore was a substantial factor in his death.

Defendant contends, however, that the jury could not properly consider starvation as an aspect of torture, because there was insufficient evidence that defendant deliberately withheld nourishment from Arthur. We disagree. Wilma S., Arthur's aunt, testified that when she returned Arthur to his parents in November 1995, he weighed 64 pounds and was in good health. In the weeks leading up to his death, neighbors reported that Arthur appeared thin and undernourished, despite the circumstance that the Jenningses had ample food in their home. When offered food or drink, Arthur "gulped" it down and asked for additional portions, suggesting he had not eaten recently. When he died on February 4, 1996, Arthur weighed only 35 pounds, having lost nearly half of his body weight in less than three months. Dr. Sheridan, who

[13] It is well established that the principles of causation, as they apply to tort law, are equally applicable to criminal law. (See, e.g., *People v. Roberts* (1992) 2 Cal.4th 271, 318–319 [6 Cal.Rptr.2d 276, 826 P.2d 274] [relying upon tort cases for authority on the issue of causation in a homicide case]; *People v. Schmies* (1996) 44 Cal.App.4th 38, 46–47 [51 Cal.Rptr.2d 185] [relying upon Rest.2d Torts, § 442A, for definition of superseding cause].)

conducted the autopsy, testified that Arthur's body had almost no fat beneath the skin, had broken down muscle tissue for energy, and lacked food in the stomach at the time of death. Arthur also suffered from acute pneumonia and from a breakdown of his immune system due to emaciation. The jury was shown photographs of Arthur taken between November 1995 and February 1996, including some taken at the autopsy, which demonstrated his decline. Dr. Sheridan further testified there was no medical reason for Arthur's dramatic weight loss over this short a period of time. The foregoing constitutes substantial evidence from which the jury reasonably could find that the Jenningses deliberately starved Arthur. This evidence, along with the evidence of chronic and acute physical abuse, is sufficient to support defendant's first degree murder conviction on the basis of murder by torture.

(c) *Sufficiency of the evidence to establish first degree premeditated murder*

Defendant contends that he was improperly convicted of first degree premeditated murder, because there is "no evidence" he killed Arthur by means of a deliberate and premeditated act. (See § 189 ["All murder which is perpetrated . . . by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree."].) As demonstrated above in response to defendant's claims related to murder by torture and murder by poison, however, there is sufficient evidence from which the jury reasonably could have found that defendant caused Arthur's death. Additionally, as demonstrated below in response to defendant's torture-murder special-circumstance claim, there is sufficient evidence from which the jury could have found that defendant intended to kill Arthur. The only remaining question for purposes of the present claim is whether there is sufficient evidence of deliberation and premeditation.

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543 [26 Cal.Rptr.3d 1, 108 P.3d 182].) In this context, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." (*Stitely, supra,* at p. 543.) If the evidence of preexisting motive and planning activity by itself is sufficient to support the first degree murder conviction on a theory

of premeditation and deliberation, we need not review the evidence concerning the manner of killing. (*People v. Jurado* (2006) 38 Cal.4th 72, 119 [41 Cal.Rptr.3d 319, 131 P.3d 400].)

In the case before us, the evidence of preexisting motive clearly supports a finding of premeditation and deliberation. After returning to the Jennings residence, Arthur soon proved to be a difficult child with significant problems, and defendant and Michelle quickly found themselves ill-equipped to handle Arthur's "fits" and were unable to manage or control his behavior. Although Wilma S. clearly had said she would take Arthur back at any time, defendant did not pursue this option, nor did he pursue the course of giving Arthur up for adoption. Instead, he attempted to "discipline" Arthur by inflicting repeated physical punishment that left Arthur's body covered in bruises, and by purposefully withholding food to the extent that Arthur lost nearly half his body weight in less than three months. The situation quickly deteriorated to the point that defendant spoke about "getting rid of," "shooting," or otherwise "killing" Arthur.

The evidence of planning activity also supports a finding of premeditation and deliberation. On the day Arthur was killed but before he was dead, Michelle and Art, Sr., went out at defendant's behest to survey the mine shaft where Arthur later was found. Two days before Arthur's death, defendant and Michelle had driven around the desert looking for a place to dump Arthur's body. A few days before that, defendant devised the story he later would use to explain Arthur's disappearance, telling a neighbor that Arthur got up in the middle of the night and ran out into the desert, and that defendant and Michelle had spent three hours looking for Arthur before finding him hiding behind a bush. After killing Arthur, the Jenningses went to the sheriff's station with a similar story, claiming that Arthur had run away in the middle of the night. Moreover, in the days leading up to Arthur's death, defendant refused to add Arthur to the family's medical insurance policy, stating, "he wouldn't be in the house long enough to need it."

Finally, the manner of killing supports the conclusion that Arthur's death was the result of preexisting thought and reflection rather than unconsidered or rash impulse. Arthur was systematically starved and continuously abused, and a potentially lethal dose of prescription and over-the-counter sedatives was deliberately administered. This conduct is entirely consistent with a preconceived design to kill, and the jury was not required to accept defendant's claims to the contrary.

In light of the foregoing, we conclude the evidence presented at trial was sufficient for a reasonable jury to have found that the killing of Arthur was

premeditated and deliberate. As such, there is sufficient evidence to support defendant's first degree murder conviction on the basis of premeditated murder.

(d) *Sufficiency of the evidence to establish the*
*torture-murder special circumstance*

Defendant claims there is insufficient evidence to support the jury's torture-murder special-circumstance finding. Reviewing the entire record in the light most favorable to the prosecution, we conclude a rational trier of fact could have found true beyond a reasonable doubt the essential elements of the torture-murder special-circumstance allegation.

 Under the applicable statute, first degree murder is punishable by death or life in prison if the murder "was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) Proof of a murder committed under the torture-murder special circumstance requires (1) proof of first degree murder, (2) proof that the defendant intended to kill and torture the victim, and (3) proof of the infliction of an extremely painful act upon a living victim. (*People v. Davenport* (1985) 41 Cal.3d 247, 271 [221 Cal.Rptr. 794, 710 P.2d 861].) The torture-murder special circumstance thus is distinguished from first degree murder by torture in that it requires defendant to have acted with the intent to kill and applies where the death involved the infliction of torture, regardless of whether the acts constituting the torture were the cause of death. (See § 190.2, subd. (a)(18); *People v. Bemore* (2000) 22 Cal.4th 809, 842–843 [94 Cal.Rptr.2d 840, 996 P.2d 1152] (*Bemore*).)

Defendant, focusing entirely on Michelle's allegedly innocuous intent in giving Arthur the sleeping pills, argues there was insufficient evidence of his intent to kill. The relevant inquiry, however, is whether defendant harbored an intent to kill when he tortured Arthur. The nature of the torture inflicted upon Arthur—the continuous infliction of serious and possibly life-threatening physical injuries while deliberately and systematically starving Arthur to the point of emaciation—is sufficient to suggest that defendant had such intent. In evaluating the evidence regarding intent to kill, the jury was not required to credit, and was entitled to reject, defendant's repeated claims to the contrary. Defendant admitted that one of his last acts of torture—hitting Arthur on the back of the head with a shovel so hard that it caused a large, gaping wound—might have killed Arthur, suggesting this was his intent. Defendant also admitted he was "more than angry" that Arthur had witnessed defendant kissing a neighbor, and when asked by a detective, "You had to finish him off. True or not true?," defendant responded, "I guess true." The evidence further established that prior to the incident involving the shovel, defendant on more than one occasion spoke about killing Arthur, kept him off the

family's medical plan "because he wouldn't be in the house long enough to use it," searched the desert for a place to dispose of Arthur's body two days before his death, and went to great lengths to conceal Arthur's death, including planning the "runaway" story he would tell the authorities. This evidence is sufficient to support a finding, in connection with the torture-murder special circumstance, that defendant intended to kill Arthur.

 Defendant also argues there is insufficient evidence that Arthur's murder "involved the infliction of torture." (§ 190.2, subd. (a)(18).) In resolving above the claim by defendant that the evidence was insufficient to sustain his conviction of first degree murder under a theory of murder by torture, we found sufficient evidence to establish that the torture perpetrated by defendant was a concurrent cause of Arthur's death. Unlike first degree murder by torture, however, the special circumstance does not require that the acts constituting the torture cause the death. (*Bemore, supra,* 22 Cal.4th at p. 843.) Rather, " 'some proximity in time [and] space between the murder and torture' " will suffice. (*Ibid.*) Whatever the " 'outer limits' " of the torture-murder special circumstance might be in this regard, the proximity requirement is satisfied when the acts of torture also were a cause of death. (*Chatman, supra,* 38 Cal.4th at p. 394.) Even absent the evidence of concurrent causation, the record in this case discloses a "close connection between the torture and the murder." (*Bemore, supra,* 22 Cal.4th at p. 843.) Arthur had received several "fresh" injuries—including the head wound defendant admitted to inflicting with a shovel and the facial injuries consistent with a smothering attempt—shortly before his death.

Finally, defendant argues that the torture-murder special circumstance is unconstitutional because the acts of torture are not required to be the sole or primary cause of the victim's death. As he acknowledges, however, we previously have rejected this argument. (*Bemore, supra,* 22 Cal.4th at p. 843.) We find no compelling reason to revisit the issue.

### (e) *Constitutional challenges to sufficiency of the evidence*

Defendant claims that even if there is sufficient evidence to support his conviction for first degree murder, the conviction violates his rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. We conclude that the jury's first degree murder verdict did not violate any of defendant's constitutional rights.

 Defendant argues that his first degree murder conviction makes him "death eligible" in a case in which he did not cause the death and the death was unintentional, in violation of the principle that a state's death penalty scheme must meaningfully narrow the class of persons eligible for the death

penalty. (See, e.g., *Zant v. Stephens* (1983) 462 U.S. 862 [77 L.Ed.2d 235, 103 S.Ct. 2733]; *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382]; *Godfrey v. Georgia* (1980) 446 U.S. 420 [64 L.Ed.2d 398, 100 S.Ct. 1759]; *Lockett v. Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *Gardner v. Florida* (1977) 430 U.S. 349 [51 L.Ed.2d 393, 97 S.Ct. 1197].) This argument fails for three reasons. First, there is sufficient evidence, as outlined above, from which a rational trier of fact could have found beyond a reasonable doubt that the torture inflicted by defendant caused Arthur's death. Second, we have held that imposition of the death penalty upon one who lacks the intent to kill is not cruel and unusual punishment in violation of the Eighth Amendment. (See, e.g., *People v. Diaz*, *supra*, 3 Cal.4th at p. 569; see also *Tison v. Arizona* (1987) 481 U.S. 137, 157–158 [95 L.Ed.2d 127, 107 S.Ct. 1676].) Third, it was defendant's first degree murder conviction in conjunction with the jury's true finding on the torture-murder special circumstance—which required an intent to kill—that ultimately made defendant eligible for the death penalty. ■ The United States Supreme Court has held that California's requirement of a special circumstance finding adequately "limits the death sentence to a small subclass of capital-eligible cases." (*Pulley v. Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 104 S.Ct. 871].) More specifically, we have held that "[t]he special circumstance of intentional murder involving the infliction of torture sufficiently channels and limits the jury's sentencing discretion consistent with Eighth Amendment principles [citation], and meaningfully narrows the group of persons subject to the death penalty [citations]." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1162–1163 [74 Cal.Rptr.2d 121, 954 P.2d 384]; see also *People v. Raley* (1992) 2 Cal.4th 870, 900 [8 Cal.Rptr.2d 678, 830 P.2d 712] [torture murder is "particularly reprehensible because the defendant intends to cause cruel suffering"].)

■ Defendant next argues that any interpretation of the evidence in this case that renders him guilty of first degree murder violates the well-settled constitutional principle prohibiting punishment determined under vague, arbitrary, or illegitimate standards. (See, e.g., *Kolender v. Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 103 S.Ct. 1855]; *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].) The existence of substantial evidence from which a rational trier of fact could find beyond a reasonable doubt the essential elements of first degree murder, as well as the torture-murder special circumstance, satisfies the due process clause of the United States Constitution, as well as its counterpart in article I, section 15 of the California Constitution. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1083 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

### 2. *Admission of out-of-court statements by Michelle Jennings*

#### (a) *Statements made to expert witness*

Defendant claims that it was reversible error for the trial court to admit certain out-of-court statements that were made by his wife and codefendant, Michelle, during her interview with the clinical psychologist who testified on Michelle's behalf as an expert witness at trial. We disagree. Even assuming error, the admission of this evidence was harmless beyond a reasonable doubt in light of the record in this case.

#### (1) *Factual background*

Nancy Kaser-Boyd, a clinical psychologist who evaluated Michelle, testified as an expert witness in support of Michelle's defense that she lacked the specific intent to kill or torture Arthur. In the course of Kaser-Boyd's direct examination, after she had testified concerning Michelle's statements regarding defendant's spousal abuse but before recounting Michelle's description of Arthur's seizures, counsel for defendant objected to the admission of any testimony regarding what Michelle told Kaser-Boyd regarding defendant's actions or statements. This objection was based on Sixth Amendment confrontation grounds. (*Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*).) Michelle's counsel countered that experts are allowed to base their opinion on hearsay and that this testimony therefore was admissible because Kaser-Boyd relied on the information in question in forming her opinion. The court overruled defendant's objection.

As is relevant to defendant's claim, Kaser-Boyd testified concerning Michelle's account of physical and sexual abuse that occurred during the earlier years of her relationship with defendant. When she was 14 years of age, Michelle ran away from home and went to stay with defendant, who was 29 at the time. Michelle said defendant was nice to her at the beginning of their relationship, but after about three or four months "he forced sexual attention on her and he also began to be physically violent with her." During a large portion of their time together, defendant worked as a truck driver and Michelle was with him on the road. She did not attend school and did not contact her parents, because she did not want to be turned in as a runaway. Michelle told Kaser-Boyd that the abuse continued: "She talked about being hit and slapped and punched, having her hair pulled, being choked on several occasions. Being battered until the point at which she told me she no longer—well, I will phrase that a different way. She always did what [defendant] said and then some of the battering eased up . . . about the last two years before Arthur died."

Next, Kaser-Boyd testified that Michelle admitted she hit and slapped Arthur when he had "fits." Michelle told Kaser-Boyd that Arthur would fall down, act as if he were unconscious although his eyes would be open, and shake and bite his tongue. Based on her training and experience, Kaser-Boyd viewed these "fits" as epileptic seizures, but Michelle explained that defendant had told her Arthur "was doing that on purpose, that it was like a temper tantrum," and Michelle believed him.

Kaser-Boyd also testified concerning defendant's and Michelle's withholding food from Arthur as a form of discipline. Michelle told Kaser-Boyd "that [defendant] told her that hitting Arthur wasn't working and they needed to try something else, and that if they didn't feed him, maybe he would do the things that they were asking him to do." Michelle said that "sometimes she went along with that, but there were other times when she agreed to sneak him food."

Finally, Kaser-Boyd testified concerning Michelle's statement that "[defendant] was talking about killing Arthur, shooting him in the head."

At the end of the direct examination of Kaser-Boyd, she gave her opinion, based in part upon her interviews with Michelle, that Michelle was fearful, felt helpless, had problems with impulse control, was socially isolated and distrustful, and suffered from dependent personality, posttraumatic stress, anxiety, and major depressive disorders. Kaser-Boyd also testified that in her opinion, the reason Michelle failed to protect Arthur was that, as a result of the extreme child abuse she herself had suffered, she lacked a good role model to follow.

### (2) Analysis

Defendant claims that the admission of the out-of-court statements made by Michelle to Kaser-Boyd as described above violated his confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*).[14] The United States Supreme Court held in *Crawford* that the confrontation clause of the Sixth Amendment of the federal Constitution prohibits "testimonial hearsay" from being admitted into evidence against a defendant in a criminal trial unless (1) the declarant is unavailable as a witness and the defendant has had a prior opportunity to cross-examine him or her, or (2) the declarant appears for cross-examination at trial. (*Crawford*, at pp. 53, 59 & fn. 9.) Defendant contends that the admission of these statements also violated his confrontation rights under

---

[14] Although *Crawford* was decided after defendant's trial and while his appeal was pending, the high court's ruling applies retroactively to his case. (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 4 [56 Cal.Rptr.3d 789, 155 P.3d 205].)

*Aranda, supra,* 63 Cal.2d 518, and *Bruton, supra,* 391 U.S. 123. *Aranda* and *Bruton* stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120–1121 [240 Cal.Rptr. 585, 742 P.2d 1306].) The People respond that no confrontation-clause violation occurred, because Michelle's statements were not offered for their truth but rather as a basis for the expert's opinion regarding Michelle's state of mind. (See generally Evid. Code, §§ 801, subd. (b), 802.)

We need not resolve the constitutional claims raised by defendant, because even assuming it was error under *Crawford* or *Aranda* and *Bruton* to admit the disputed statements made by Michelle to Kaser-Boyd, such error was harmless beyond a reasonable doubt. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1015–1016 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [finding it unnecessary to examine a "complex constitutional question," because any error was harmless]; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 106 S.Ct. 1431] (*Van Arsdall*) [an otherwise valid conviction should not be set aside for confrontation clause violations if, on the whole record, the constitutional error was harmless beyond a reasonable doubt]; *Harrington v. California* (1969) 395 U.S. 250, 253–254 [23 L.Ed.2d 284, 89 S.Ct. 1726] (*Harrington*) [*Aranda-Bruton* error subject to harmless error analysis under the rule of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*)].)

Defendant focuses almost exclusively on the alleged prejudice he suffered from the admission of Michelle's statement to Kaser-Boyd concerning defendant's having withheld food from Arthur as a form of punishment, which he contends is the only evidence indicating that he deliberately starved Arthur. He argues that without this statement, there is insufficient evidence to establish that defendant tortured Arthur by starving him, that without proof of torture by starvation, there is insufficient evidence to support the guilty verdict and special circumstance finding, and hence the judgment must be reversed.

This argument is contradicted by the record. There was overwhelming circumstantial evidence apart from Michelle's statement, and described in detail above, from which a reasonable jury could have found that the Jenningses deliberately starved Arthur. This includes evidence establishing that in less than three months, Arthur deteriorated from a healthy 64 pounds to a severely emaciated 35 pounds, which Dr. Sheridan testified was "a dramatic weight loss over a short period of time"; that at the time of his death, Arthur had no food in his stomach, almost no body fat—including in

the areas where bodies normally store a layer of fat—and his muscles were wasting; that there was no medical reason Arthur's body would not have been able to absorb food; and that the malnourishment suffered by Arthur occurred despite the circumstances that the Jenningses had ample food in their home and that other family members, including Arthur's baby sister, appeared physically healthy and well-fed.

Defendant's argument, moreover, ignores the circumstance that his entire course of conduct, and not just the act of starvation, constituted torture. There was overwhelming direct and circumstantial evidence establishing that, in addition to purposefully depriving Arthur of food for an extended period of time, defendant also brutally and continuously physically abused Arthur. This includes evidence demonstrating that defendant burned Arthur's hand on the stove, gave him black eyes on multiple occasions, hit him with a two-by-four, violently shook and banged Arthur's head against the wall, kicked him in the midsection, duct-taped his mouth and hands, attempted to smother him, and hit Arthur on the back of the head with a fireplace shovel shortly before he died.

Defendant's trial strategy further contradicts his claim that he was prejudiced by the admission of Michelle's statement concerning defendant's withholding of food as punishment. Defendant did not dispute that he starved and physically abused Arthur; instead his defense was that he intended only to discipline the child and did not intend to kill him. In support of this argument, defense counsel specifically alluded to Michelle's statement about withholding food from Arthur as a form of punishment: "And when the child is misbehaving according to [defendant]—I mean, see, in order to determine state of mind, intent, you've got to get into this. So I'm using 'misbehaving' in quotes, because that's what [defendant] is perceiving, *the child is misbehaving*. What do you do? Well—based upon his personality disorders and his upbringing, what do you do? Well, that's clear what you do, and that's what happened to the child. That's what you do. You spank. If that doesn't work, you beat. If he's peeing, pooping, whatever, *you withhold food*. When nothing else works, you—you heard that Michelle said he said, [defendant] said, 'I'm going to,' you know, 'end this now,' and he puts the kid's hand on the flame. Okay? He's upping the ante to try and—he keeps battering this little child to try to force him into compliance to behave, to behave. And *that's awful child abuse without, you know, any excuse,* and he should be convicted of it. The difference, the difference, is, you know, for all those other crimes, it doesn't require a premeditated, malice intent to kill, a specific intent to kill for those other crimes. Okay? That's the difference." If anything, the exclusion of Michelle's statement concerning defendant's withholding of food as punishment would have harmed defendant, as it was the only direct evidence supporting his defense.

In light of the totality of the record concerning defendant's severe and chronic physical abuse and starvation of Arthur, we are persuaded beyond a reasonable doubt that Michelle's statement regarding defendant's withholding of food as punishment did not contribute to the verdict or special circumstance finding. (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 111 S.Ct. 1884].) Accordingly, even if we were to assume a confrontation-clause violation occurred with respect to the admission of this statement, reversal of the judgment would not be warranted. (*Van Arsdall, supra*, 475 U.S. at p. 681; *Harrington, supra*, 395 U.S. at pp. 253–254.)

Alternatively, defendant claims the admission of Michelle's statement to Kaser-Boyd concerning defendant's withholding of food violated the Evidence Code prohibition against hearsay evidence. (See Evid. Code, § 1200.) This claim was forfeited, however, by defendant's failure to make a hearsay objection at trial.[15] Even if we were to assume it was not forfeited and also that the statement was offered for the truth of the matter asserted, any presumed error in admitting this alleged hearsay evidence was not prejudicial, for the same reasons that any presumed *Crawford* or *Aranda-Bruton* error was harmless beyond a reasonable doubt. (Accord, *People v. Gutierrez* (2009) 45 Cal.4th 789, 813 [89 Cal.Rptr.3d 225, 200 P.3d 847] (*Gutierrez*) [although child's improper hearsay testimony provided the only direct evidence implicating the defendant in a murder, there was "profuse circumstantial evidence" of the defendant's guilt].)

Finally, because we conclude that defendant suffered no prejudice from the admission of Michelle's statements to Kaser-Boyd regarding defendant's withholding of food from Arthur, we also reject defendant's related claim that the judgment must be reversed on the grounds that the trial court erred in denying his pretrial severance motion and that defendant suffered "important prejudice" and "gross unfairness" because of the joint trial and the resulting admission of this statement.

With respect to Michelle's statements to Kaser-Boyd regarding spousal abuse, Arthur's "tantrums," and defendant's wanting to shoot and kill Arthur,

---

[15] Anticipating that we would find this claim forfeited, defendant contends it is still cognizable on appeal under the rubric of ineffective assistance of counsel, based upon his counsel's failure to object. Defendant may not, however, transform a forfeited claim into a cognizable claim merely by asserting ineffective assistance of counsel. (*People v. Riel* (2000) 22 Cal.4th 1153, 1202–1203 [96 Cal.Rptr.2d 1, 998 P.2d 969] (*Riel*).) Such a claim is different from a claim of the underlying forfeited error. (*Ibid.*) In any event, we need not address defendant's ineffective-assistance-of-counsel claim in light of our conclusion that any error in admitting Michelle's statements to Kaser-Boyd was harmless beyond a reasonable doubt. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 249 [41 Cal.Rptr.3d 593, 131 P.3d 995] [constitutionally deficient representation cannot be established if error was harmless beyond a reasonable doubt].)

any presumed error in admitting this evidence was harmless beyond a reasonable doubt for the additional reason that these statements were merely cumulative of actual and adoptive admissions made by defendant during the videotaped joint interview that the detectives conducted with the two suspects, as demonstrated below.

### (b) *Statements made during joint interview with detectives*

Defendant also claims that the trial court committed reversible error under *Crawford*, as well as under *Aranda* and *Bruton*, by admitting numerous statements made by Michelle during the joint interview the detectives conducted with defendant and Michelle. As we explain below, because the statements qualify as adoptive admissions, their admission into evidence did not violate defendant's Sixth Amendment confrontation rights under *Crawford*, or under *Aranda* and *Bruton*. Even assuming for purposes of argument that it was error to admit some of Michelle's statements from the joint interview as adoptive admissions, any presumed error was harmless beyond a reasonable doubt in the context of the entire joint interview and the record as a whole.

### (1) *Factual background*

After obtaining separate statements from defendant and Michelle and being led to Arthur's body in the mine shaft, the detectives decided to interrogate the two suspects together. At the outset of the joint interview, the detectives obtained *Miranda* waivers (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) and told defendant and Michelle that the detectives wanted to explore inconsistencies between the separate statements made by the suspects.

The detectives commenced by focusing on the physical abuse inflicted on the victim, asking defendant about his separate statement that Michelle began "beating on" Arthur shortly after the child arrived at their home and that Michelle was more abusive than defendant, who merely disciplined Arthur with spankings and "time-outs." Michelle interjected to deny that she ever hurt Arthur, claiming that all she did was spank him. Defendant responded that both he and Michelle probably were "overzealous" in inflicting punishment.

Later in the interview, Michelle accused defendant of dragging Arthur home, throwing him onto the porch, and bruising his forehead. Defendant conceded that on one occasion he had dragged Arthur home, but claimed Arthur hit his head after tripping over a step on the porch.

Michelle subsequently admitted that she disciplined Arthur by spanking him, sending him to the corner, and "smack[ing] him" to bring him out of his

"fits," but claimed that defendant recently had gotten "carried away" and began hitting Arthur with his fist, including in the face. Defendant conceded he probably had been abusive, but could not remember punching Arthur in the face with his fist.

Michelle further accused defendant of knocking Arthur down with his elbow, kicking him in the midsection, making Arthur hold a two-by-four over his head and knocking him down when he dropped the beam, and holding his hand over the stove and burning it. At first, defendant reluctantly admitted committing some of these abuses, conceding that he was "abusive" and that "most" of Arthur's injuries were caused by defendant. But when Michelle pleaded with defendant "[p]lease tell them" and "[d]on't do this to me," defendant admitted to all of the abuse Michelle had described—to "everything she's saying." Nevertheless, defendant continued to assert that Michelle also was abusive, although not "overly" so, and that some of her conduct may have contributed to Arthur's injuries, but only in a "very minor" way. Later in the interview, defendant specifically admitted burning Arthur's hand on the stove and pushing him to the ground.

Defendant also admitted that during one of Arthur's seizures that took place a few days before he died, defendant shook Arthur so hard that Arthur's head hit the wall. When Michelle tried to stop defendant, defendant pushed her away. Defendant stated he "caught [his] senses" and only stopped when Michelle began "screaming" that defendant was about to kill Arthur.

Defendant further admitted placing a sock in Arthur's mouth and also using duct tape to silence Arthur, and conceded he may have used duct tape to bind Arthur's hands. Defendant claimed he took these actions to keep Arthur from biting his tongue or gouging himself with his fingers during his seizures.

The detectives next confronted defendant regarding his prior statement that he and Michelle, on more than one occasion, had spoken about "killing" or "get[ting] rid of" Arthur. At that point, Michelle interrupted, stating that she never wanted to kill Arthur and that she told defendant they could not take such action. Michelle claimed she proposed sending Arthur back to defendant's sister, Wilma, or leaving him with his paternal grandfather, Art, Sr. She asked defendant, "Did I kill Arthur? Please. Did I kill him," to which defendant responded, "No." When the detectives then asked defendant how he planned to kill Arthur, he responded that he did not know. Michelle again interjected, volunteering that defendant talked about shooting Arthur, but that she had responded negatively, stating they should send him to his aunt or grandfather. Defendant admitted that Michelle's account was accurate. He further conceded that he had spoken about killing Arthur, but claimed he had changed his mind, did not mean to kill Arthur, and did not want Arthur to die.

The detectives inquired concerning defendant's prior statement that two days before Arthur's death, defendant and Michelle had gone to the desert to look for a place to dump Arthur's body. Michelle admitted they drove around in the desert, but claimed she did not know they were looking for a place to dump a body. Defendant agreed, stating that looking for a dumping site was only "in the back of my mind." Defendant said his father had told him about the mine shaft during a discussion with some neighbors, and Michelle claimed that defendant had his father take her to the mine shaft on the day Arthur died because she had never seen one before. Michelle indicated that before she left to look at the mine shaft with Art, Sr., she administered CPR to Arthur "cause he was breathing kind of . . . hard." Defendant also claimed to have administered CPR to Arthur when he later stopped breathing, admitting that at that time Arthur's head still was bleeding from the shovel incident.

The detectives next addressed the efforts to conceal Arthur's death, asking defendant about his prior statements that Michelle had dug the original hole for the body and subsequently had moved the body to the mine shaft. Michelle turned to defendant, asking him, "why are you doing this to me," and pleading for defendant to tell the detectives who had done these things. Defendant eventually admitted that he did "all of it," conceding that he had moved the body to the mine shaft because he was afraid that someone would find it, and that he had planned to throw old tires on top of the body to hide it. Defendant and Michelle also admitted having cleaned up Arthur's bedroom after disposing of his body. Defendant related that there had been blood on the walls, possibly on the floor as well, and admitted that the blood may have been from when he shook Arthur and Arthur's head hit the wall. He also admitted to burning Arthur's bed sheets and the gloves used to bury him, and hiding Arthur's bloody clothes and glasses in a trash dumpster. Defendant said, "I know what I [did] is wrong" and "I know I'm going to have to pay for this."

Michelle claimed she wanted to report Arthur's death, but defendant would not let her, claiming they would go to jail for child abuse. When she asked defendant, "Why didn't you let me report it when I told you I was going to," defendant replied, "Because I was scared. I was scared of losing everything that we have." When Michelle further claimed it was defendant's idea to bury Arthur, defendant confirmed Michelle "went along with everything I said." Michelle indicated she acceded to defendant out of fear, because defendant once told her he would kill her if she caused him to be arrested. Defendant admitted making that statement, but claimed that was "a long time ago" and that he did not mean it. Michelle also indicated that defendant threatened to hurt her and baby Pearl if she told anyone about what had happened to Arthur, and that defendant had brought a gun when they went to move Arthur's body. Defendant denied that allegation, claiming, "what I said was,

that if we got caught, it would hurt all of us[,] . . . it would hurt you and Pearl 'cause you'd be separated." After additional pleas from Michelle, defendant eventually admitted that he threatened to "beat her ass up" in order to force her to go along with his actions. In summary, he admitted, "I used all kind of tactics and everything else," that Michelle "went along with everything I did" most likely out of fear, and that "she only did what I told her to do." He repeated this sentiment several times and did not disagree when Michelle said she went along with defendant's efforts to conceal Arthur's death because she was threatened, although he remained adamant that he did not threaten her with the gun.

At one point, defendant volunteered that he and Michelle had administered prescription drugs to Arthur, such as Vicodin, in order to "heal him up" so they could send him back to Wilma. The detectives then inquired concerning defendant's prior statement that Michelle had administered medication to Arthur, that defendant had attempted to stop her by hiding the medication, but that she had found it and continued to administer the medication to Arthur. Defendant admitted that this story was not true, that they both gave Arthur medication, and that he had told Michelle to do so because he thought it would help make Arthur better. Although claiming he did not consider what the pills would do to a child who weighed 35 pounds, defendant also claimed to have cut the pills in halves or quarters. For her part, Michelle admitted that, in order to protect defendant, she previously had lied to the detectives about administering several pills to Arthur. Michelle claimed she actually gave Arthur only one Valium that defendant instructed her to administer to Arthur to relax his muscle spasms, and two sleeping pills at defendant's direction in order to put Arthur to sleep.

The detectives inquired why defendant told Michelle that the couple did not need to list Arthur on their medical insurance policy because Arthur "wouldn't be in the house long enough to need it." Defendant claimed he "had a change of heart about killing [Arthur]" and was referring to the idea of returning Arthur to Wilma.

The detectives also confronted defendant concerning his prior assertion that Michelle had hit Arthur with a fireplace shovel on the day he died. Michelle again objected, asking defendant whether that was true. Defendant admitted that was a lie, asserting that no one had hit Arthur with a shovel but instead Arthur had hit his head on the kitchen table. Defendant explained that he did not tell Michelle about this incident, because he was afraid to do so. After the detectives persisted, defendant again changed his story, claiming that he was holding the shovel when he sat Arthur down against a wall and that Arthur landed against the shovel. The detectives also refused to believe this story and, after trying to explain how Arthur fell on the shovel, defendant eventually said he could not remember how Arthur hit his head.

At one point, Michelle asked to leave the interview room and was escorted outside. In her absence, defendant admitted he "used [Michelle's] love against her," as well as fear and intimidation. He admitted he was afraid that without having Michelle "under [his] thumb or without intimidating her or putting fear in her[,] that she would tell on [him]." When Michelle returned to the room, the detectives left the two of them alone but continued to record their conversation. Defendant insisted that Arthur's death was partly Michelle's fault but said he was going to take the blame for it: "I'll sign a confession and everything." They spoke about defendant's likely punishment and about how much they loved each other. Defendant mentioned that he had led the officers to Arthur's body, "otherwise they'd never found that son of [a] bitch." Michelle sought to confirm that defendant would confess so she could go home to care for Pearl, to which defendant replied, "I will. I'll do it . . . . I'll just have them type it up and I'll sign it."

When the detectives returned, they immediately asked who had killed Arthur. Both defendant and Michelle initially denied killing Arthur, but defendant eventually admitted, "I probably did" by "abusing him and [giving him] the medication and stuff like that," but again claimed he did not intend to kill Arthur.

The detectives then resumed questioning the two suspects concerning the shovel incident. Defendant finally admitted that a female neighbor, Cora Grein, had been in the house while Michelle was out with Art, Sr. At this time, one of the detectives took Michelle outside again. In her absence, defendant admitted that Arthur saw him kissing Grein. Defendant claimed that Grein became angry and hit Arthur with the shovel in order to keep Arthur from telling her husband. Defendant claimed that he kicked Grein out of the trailer and tried to help Arthur by cleaning the wound and giving him some drugs, but that Arthur died within an hour.

Under further questioning, however, defendant's story changed again, and he finally confessed that he hit Arthur with the shovel after Arthur saw him kissing Grein and admitted that he then believed he "had to finish [Arthur] off." Nevertheless, defendant claimed he did not intend to kill Arthur and, indeed, had attempted to save Arthur's life by administering CPR, because defendant had experienced a "change of heart." Defendant further admitted that he caused all the bruises on Arthur's body, that Michelle never beat Arthur, that defendant was abusive toward Michelle and coerced her into going along with his actions, that Michelle did not have "much" involvement, and that he was responsible for Arthur's death.

After defendant's confession, Michelle was brought back into the room and defendant told her about hitting Arthur in the head with a shovel. Michelle

expressed shock and wanted to know why defendant had done this. The detectives again left the two alone together and recorded their conversation. In the absence of the detectives, Michelle pleaded with defendant to sign a confession so that she could continue to care for Pearl. The two pledged their love for each other, and defendant asked Michelle to take care of their baby girl. The joint interrogation ended at that point.

Prior to trial, defendant moved to sever his trial from Michelle's trial on the grounds of incompatible defenses and *Aranda-Bruton* issues. (See *Bruton, supra*, 391 U.S. 123; *Aranda, supra*, 63 Cal.2d 518.) When the motion was discussed at a June 1997 status conference, the prosecutor told the court that his intent at that point was to introduce only the joint interview of the two codefendants with the detectives and not defendant's and Michelle's statements from their separate interviews with the officers. At a February 1998 hearing on the motion, defendant argued that the alleged "admissions" from the joint interview were inherently untrustworthy under the facts presented and that a joint trial would violate defendant's confrontation rights under the Sixth Amendment of the United States Constitution as interpreted by the *Aranda* and *Bruton* decisions. The trial court noted, and defendant apparently conceded, that the joint interview would be admissible at any separate trial. The prosecutor also argued that the joint interview consisted of a combination of adoptive admissions, declarations against interest, and confessions, all of which were admissible. At a March 1998 hearing, the trial court denied defendant's severance motion, concluding that the joint interview contained party admissions as well as adoptive admissions, all of which were trustworthy.

During the trial, before the videotape of the joint interview was shown to the jury, defendant renewed his continuing objection to its admission. The court overruled the objection, incorporating its earlier ruling. The prosecutor then played the entire joint interview for the jury.

(2) *Analysis*

It is undisputed that defendant's own statements made during the joint interview were admissible against him, as admissions of a party, under Evidence Code section 1220. (See *People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5 [22 Cal.Rptr.3d 305, 102 P.3d 228] ["section 1220 covers all statements of a party, whether or not they might otherwise be characterized as admissions" (italics omitted)].) Defendant contends, however, that the concurrent admission of numerous "essential" statements made by Michelle during the joint interview violated his right to confrontation under *Crawford* and the *Aranda-Bruton* line of cases. (See *Crawford, supra*, 541 U.S. 36; *Bruton, supra*, 391 U.S. 123; *Aranda, supra*, 63 Cal.2d 518.) We conclude there was

no violation of defendant's confrontation rights, because Michelle's disputed statements qualify as "adoptive admissions" under Evidence Code section 1221.

 The law pertaining to adoptive admissions is well settled. "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) As this court has explained, "[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." (*People v. Preston* (1973) 9 Cal.3d 308, 313–314 [107 Cal.Rptr. 300, 508 P.2d 300] (*Preston*).)

 " '[A] typical example of an adoptive admission is the accusatory statement to a criminal defendant made by a person *other* than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true.' [Citation.]" (*People v. Silva* (1988) 45 Cal.3d 604, 623–624 [247 Cal.Rptr. 573, 754 P.2d 1070] (*Silva*).) "For the adoptive admission exception to apply, however, a direct accusation in so many words is not essential." (*People v. Fauber* (1992) 2 Cal.4th 792, 852 [9 Cal.Rptr.2d 24, 831 P.2d 249] (*Fauber*).) " 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' [Citation.]" (*Riel, supra,* 22 Cal.4th at p. 1189.)

"Moreover, it is well settled that an adoptive admission can be admitted into evidence without violating the Sixth Amendment right to confrontation 'on the ground that "once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions,* and are admissible on that basis as a well-recognized exception to the hearsay rule." ' [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 672 [80 Cal.Rptr.3d 126, 187 P.3d 970].) "Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant.

Accordingly, no confrontation right is impinged when those statements are admitted as adoptive admissions without providing for cross-examination of the declarant." (*Silva, supra,* 45 Cal.3d at p. 624.) Stated another way, when a defendant has adopted a statement as his own, "the defendant himself is, in effect, the declarant. The 'witness' against the defendant is the defendant himself, not the actual declarant; there is no violation of the defendant's right to confront the declarant because the defendant only has the right to confront 'the witnesses against him.' [Citations.]" (*U.S. v. Allen* (7th Cir. 1993) 10 F.3d 405, 413.)

 It follows that the admission of an out-of-court statement as the predicate for an adoptive admission does not violate the principles enunciated in *Crawford* or in *Aranda* and *Bruton*. (*People v. Roldan* (2005) 35 Cal.4th 646, 711, fn. 25 [27 Cal.Rptr.3d 360, 110 P.3d 289] ["admission of defendant's adoptive admissions did not violate the confrontation clause as interpreted in *Crawford*"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 [87 Cal.Rptr.3d 209, 198 P.3d 11]; *People v. Combs* (2004) 34 Cal.4th 821, 841–843 [22 Cal.Rptr.3d 61, 101 P.3d 1007] (*Combs*) [no *Crawford* violation when incriminating statements made during joint interrogation were admitted as adoptive admissions]; *Preston, supra,* 9 Cal.3d at p. 315 [admission of evidence under the adoptive-admission exception to the hearsay rule does not violate the *Aranda* rule]; *People v. Osuna* (1969) 70 Cal.2d 759, 765 [76 Cal.Rptr. 462, 452 P.2d 678] [there is no *Aranda-Bruton* error when conversation among codefendants was admitted under adoptive-admission rule].)

 Instructive on this point is *People v. Castille* (2005) 129 Cal.App.4th 863 [29 Cal.Rptr.3d 71] (*Castille*), which involved a situation almost identical to the one presented here—a jointly conducted law enforcement interview of three defendants, which was admitted at their joint trial for murder with special circumstances and attendant enhancements. Relying upon many of the authorities discussed above, the appellate court held that the admission in evidence of adoptive admissions made during the joint interview did not violate the principles enunciated in *Crawford,* or in *Aranda* and *Bruton*. The court included a detailed discussion of our decision in *Combs, supra,* 34 Cal.4th at pages 841–843, citing it for the proposition that "adoptive admissions, elicited during a joint police interrogation, do not implicate the Sixth Amendment and thus do not constitute *Crawford* error." (*Castille, supra,* 129 Cal.App.4th at pp. 877–878.) The defendants in *Castille* argued that *Combs* was distinguishable, however, because the declarant and the defendant in *Combs* were tried separately. The defendants reasoned that adoptive admissions are not properly admitted at a joint trial, because admission of the codefendant's statement, necessary to establish the content of the adoptive admission, runs afoul of the *Aranda-Bruton* rule, which "addresses the situation in which a codefendant's out-of-court confession incriminates not

only himself, but also another defendant" and which holds that "[w]hen such a confession is introduced at a joint trial, the defendant is deprived of his Sixth Amendment confrontation clause rights, even when the jury is instructed to consider the confession only as to the codefendant. [Citation.]" (*Castille, supra*, 129 Cal.App.4th at p. 878.) The Court of Appeal rejected the defendant's argument: "In such a situation, the statement of defendant A implicating defendant B is admitted not for its truth, but to supply meaning to B's response adopting A's statement as his own."[16] (*Castille, supra*, at p. 878; see also *Combs, supra*, 34 Cal.4th at p. 842 ["Purcell's statements incriminating defendant were not admitted for purposes of establishing the truth of the matter asserted, but were admitted to supply meaning to defendant's conduct or silence in the face of Purcell's accusatory statements."].)

With these principles in mind, we turn to defendant's claim that the court erred in admitting several statements made by Michelle during the joint interview. Michelle's disputed statements can be grouped into three general categories that cover all of defendant's allegations of error in this respect. Because Michelle repeated many statements during the course of the interview, some may fall into more than one category, although they are listed below only once.

The first category consists of statements, made by Michelle during the joint interview, that defendant expressly admitted or accepted at the time the statement was made. These statements are clearly admissible as adoptive admissions and include the following: that Michelle did not kill Arthur; that Michelle did not hit Arthur on the head with the fireplace shovel; that defendant had not told Michelle about the shovel incident; that defendant talked about shooting Arthur in the head but Michelle told him not to kill Arthur; that they should return Arthur to defendant's sister or give him to defendant's father; that defendant, not Michelle, dug the hole where they first

---

[16] The jury in *Castille* was instructed pursuant to CALJIC No. 2.71.5, as follows: " 'If you should find from the evidence that there was an occasion when a defendant, one, under conditions which reasonably afforded him an opportunity to reply, two, failed to make a denial or made false, evasive or contradictory statements in the face of an accusation expressed directly to him or in his presence, charging him with the crime for which the defendant is now on trial or tending to connect him with its commission; three, he heard the accusation and understood its nature, then the circumstances of the silence and/or conduct on that occasion may be considered against him as indicating an admission that the accusation thus made is true. [¶] Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and/or conduct of the accused in the face of it. Unless you find that the defendant's silence and/or conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement.' " (*Castille, supra*, 129 Cal.App.4th at pp. 878–879, fn. 7.) In defendant's case, the jury was not instructed pursuant to CALJIC No. 2.71.5. Defendant, however, did not request such an instruction, and the trial court was under no duty to so instruct absent a request from counsel. (*People v. Carter* (2003) 30 Cal.4th 1166, 1197–1198 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

buried Arthur and then moved his body to the mine shaft; that Michelle did not know that when they were driving in the desert two days before Arthur died, they were scouting for a place to dump his body; that defendant had threatened in the past to kill Michelle if she ever did anything that sent him to jail; that most of Arthur's injuries were caused by defendant; that defendant made Arthur hold a two-by-four over his head and hit him with it when Arthur dropped the board; that defendant "shook the hell out of" Arthur, making his head hit the wall, and that when Michelle tried to stop defendant, he pushed her away; that defendant put duct tape over Arthur's mouth and possibly around his hands, and that Michelle removed the tape; and that defendant put a sock in Arthur's mouth during one of Arthur's "fits."

The second category consists of statements, made by Michelle during the joint interview, that defendant failed to deny or to which he furnished an equivocal or evasive response at the time the statement was made. With respect to these statements, we observe that defendant waived his right to remain silent at the beginning of the interview and never indicated an intention to invoke that right at any point during the interview. In fact, defendant continuously made new admissions throughout the interview. Additionally, on numerous occasions during the interview, defendant clearly voiced disagreement with statements made by Michelle. For example, defendant repeatedly denied ever threatening Michelle with a gun.

 Under these circumstances, we conclude statements made by Michelle that were met by defendant's silence, or by equivocal or evasive responses on his part, properly are viewed as adoptive admissions, and therefore were admissible in evidence.[17] (*Fauber, supra,* 2 Cal.4th at p. 852; *Preston, supra,* 9 Cal.3d at pp. 314–315; accord, *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093–1094 [73 Cal.Rptr.2d 203] ["Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights."].) Defendant's implied adoptive admissions include the following: that Michelle was not home when Arthur received the head wound or when he died; that Michelle never injured

---

[17] In *Jennings, supra,* 112 Cal.App.4th 459, involving the appeal of Michelle's conviction, the appellate court held that silence during a post-*Miranda* custodial interrogation generally is interpreted to be an assertion of the right to remain silent and therefore cannot be used to prove an adoptive admission. (*Id.* at pp. 472–474.) *Jennings,* however, was decided before our decision in *Combs, supra,* 34 Cal.4th 821, which ruled that a declarant's accusatory statements made during a joint police interview properly may be brought before a jury "to supply meaning to defendant's conduct or *silence* in the face of [the accusations]," and that receiving such adoptive admissions in evidence does not implicate the Sixth Amendment. (*Jennings,* at pp. 842–843, italics added.) We disapprove *People v. Jennings, supra,* 112 Cal.App.4th 459, to the extent it is inconsistent with *Combs* or our decision in the present case. (Accord, *Castille, supra,* 129 Cal.App.4th at p. 880 [opining that *Combs* cast doubt upon the continued viability of *Jennings* on this question].)

Arthur; that defendant spoke before Arthur's death of killing him; that Michelle did not want to kill Arthur or for him to die; that although Michelle gave Arthur prescription pain medication because defendant told her to do so, she gave him only one Valium and defendant gave him the remainder of the pain pills; that defendant had Michelle go to the store to acquire sleeping pills in order to put Arthur to sleep; that on various occasions defendant dragged, hit, slapped, punched, kicked, pushed, and knocked down Arthur; that defendant burned Arthur's hand by holding it over the stove; that Michelle was not responsible for Arthur's death; and that defendant told Michelle he was not going to put Arthur on their medical insurance policy, because Arthur was not going to "be around long enough." In many instances, later during the course of the interview and in response to the detectives' questioning or other statements made by Michelle, defendant affirmatively admitted the substance of many of these statements, thus expressly adopting them as his own.

The third and smallest category are statements made by Michelle during the joint interview that defendant initially denied at the time the statements were made. An examination of the entire interview reveals, however, that when the same or similar statements were repeated later on during the interview, defendant admitted the substance of these statements as well. Although, for obvious reasons, a statement that is expressly denied by a defendant does not qualify as an adoptive admission, we conclude that any error from the admission of such statements in this case was harmless beyond a reasonable doubt, because these statements were consistent with, and cumulative to, other admissions made by defendant during the course of the interview, and thus could not have damaged defendant's case more than his own admissions. (Accord, *People v. Davis* (2009) 46 Cal.4th 539, 620 [94 Cal.Rptr.3d 322, 208 P.3d 78] [even assuming there was a *Crawford* violation in allowing the prosecution to introduce hearsay statements describing defendant's involvement in previous robberies, any error was harmless beyond a reasonable doubt, because the prosecution also introduced defendant's admissions to the commission of each of the robberies].) For example, Michelle repeatedly accused defendant of having lied to the detectives in his separate interview about things she was supposed to have said or done, and pleaded with defendant, "Please . . . don't drag me down." Defendant at first responded, "I'm not trying to drag anybody down," but during the course of the interview admitted to having lied to the detectives in several instances about Michelle's involvement in the abuse suffered by Arthur, in his death, and in the efforts to conceal his death. Defendant also initially denied threatening to harm Michelle or Pearl in the event Michelle ever told anyone what had happened to Arthur or did not go along with the efforts to conceal Arthur's death, but defendant later conceded, among other things, that "I told

her that I'd beat her ass up and I told her not only that, but if we didn't do what we needed to do, we were gonna lose Pearl . . . ."

Defendant alternatively argues that Michelle's statements cannot constitute adoptive admissions, because defendant's conduct at most demonstrates that he was taking the blame for Arthur's death in order to spare Michelle. In this respect, we agree with the People that defendant benefited from the jury's having seen the entire interview. If the jury had heard only defendant's admissions, it would not have witnessed Michelle's behavior and her efforts to have defendant minimize her role in Arthur's abuse and death and in the efforts to conceal his death.

### 3. *Admission of out-of-court statements made by Mary Dobson*

Defendant asserts a due process violation occurred based upon the allegedly unfair impact of Kaser-Boyd's testimony concerning an out-of-court statement made by Mary Dobson, a neighbor of the Jenningses', to investigators. This statement related Dobson's view "that Martin Jennings controlled Michelle Jennings." Defense counsel's objection to the admission of this evidence on the basis of the Sixth Amendment confrontation clause of the United States Constitution was overruled. Defendant claims the trial court erred prejudicially, because Dobson's secondhand or thirdhand hearsay was contrary to other evidence that suggested Michelle dominated defendant. We conclude any claimed error was harmless beyond a reasonable doubt. Dobson's statement was cumulative to, and consistent with, admissions made by defendant during the joint interview, from which a reasonable jury could have concluded that defendant controlled Michelle. For example, defendant admitted that he physically threatened Michelle and had threatened to kill her in the past if she ever did anything that sent him to jail, that he manipulated Michelle with love as well as with fear and intimidation, that he was afraid that without having Michelle "under [his] thumb or without intimidating her or putting fear in her . . . she would tell on [him]," and that he was abusive toward Michelle and coerced her into going along with his actions. The single statement attributed to Dobson could not have damaged defendant's case more than his own admissions.

### 4. *Alleged instructional errors*

#### (a) *Failure to instruct the jury concerning accessory liability pursuant to a modified version of CALJIC No. 6.40*

Defendant claims the trial court erred in failing to instruct the jury on its own motion concerning accessory liability pursuant to a modified version of

CALJIC No. 6.40.[18] He concedes there might have been "some" evidence suggesting that defendant's conduct in aiding and abetting occurred either before and during the commission of the murder, or after it, or both, but asserts there was "good reason" for the jury to conclude that defendant did not aid and abet in the act that directly caused Arthur's death. He argues that the trial court therefore had a duty to instruct on its own motion concerning accessory liability, as a general principle of law relevant to the issues, so the jury could have the option of convicting defendant only of the crime of being an accessory after the fact. Defendant contends the failure to give this instruction is reversible error that further violated his constitutional right to due process guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution. We conclude this claim is without merit.[19]

██ Defendant is correct in observing that "the trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter, supra,* 30 Cal.4th at p. 1219.) The obligation to instruct includes giving instructions on lesser included offenses when warranted by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) "Under California

[18] Section 32, which defines the crime of being an accessory to a felony, provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." Prior to the 2005 adoption of the CALCRIM instructions, CALJIC No. 6.40 was the recommended instruction for cases in which a defendant was charged under section 32. The instruction provides: "Defendant is accused [in Count[s]] _____] of having committed the crime of being an accessory to a felony in violation of section 32 of the Penal Code. [¶] Every person who, after a felony has been committed, harbors, conceals, or aids a principal in that felony, with the specific intent that the principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that the principal has committed that felony or has been charged with that felony or convicted thereof, is guilty of the crime of accessory to a felony in violation of Penal Code section 32. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A felony, namely, _____ was committed; [¶] 2. Defendant harbored, concealed or aided a principal in that felony with the specific intent that the principal avoid or escape [arrest] [trial] [conviction or punishment]; and [¶] 3. Defendant did so with knowledge that the principal [committed the felony] [was charged with having committed the felony] [was convicted of having committed the felony]."

[19] Defendant acknowledges that his trial counsel did not request a jury instruction concerning accessory liability. Anticipating that we might find this claim of error to have been forfeited, defendant argues that the failure to request an accessory-liability instruction constituted ineffective assistance of counsel. We need not address defendant's ineffective-assistance-of-counsel claim, in light of our conclusion that the trial court was not required to give a jury instruction concerning accessory liability. (Accord, *People v. Kraft* (2000) 23 Cal.4th 978, 1065 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*) [because trial court correctly declined to instruct on accessory liability, defendant's related claim of ineffective assistance of counsel also must fail].)

law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (*Birks*).)

■ To the extent defendant claims the trial court had a duty to instruct the jury on its own motion concerning the crime of being an accessory after the fact as a *lesser included offense* of murder, however, his claim necessarily fails. It is well settled that " '[m]urder can be committed without the murderer being an accessory after the fact,' " and " '[t]he latter offense, therefore, is not necessarily included in the former.' [Citations.]" (*People v. Majors* (1998) 18 Cal.4th 385, 408 [75 Cal.Rptr.2d 684, 956 P.2d 1137].)

■ To the extent defendant contends the accessory instruction was required because the crime of being an accessory after the fact is a *lesser related offense* of murder, his claim fails as well. A defendant has no right to instructions on lesser related offenses, even if he or she requests the instruction and it would have been supported by substantial evidence, because California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties. (*Kraft, supra*, 23 Cal.4th at pp. 1064–1065; *Birks, supra*, 19 Cal.4th at pp. 136–137.) Therefore, the trial court was not required to instruct the jury on its own motion concerning the lesser related offense of being an accessory after the fact, whether or not there was substantial evidence supporting a theory of accessory liability.

■ To the extent defendant argues the trial court should have given an accessory instruction on the theory that being an accessory after the fact is a *defense* to the prosecution's theory that defendant aided and abetted Michelle in murdering Arthur, his argument still fails. Being an accessory to murder is not a defense to aiding and abetting the commission of murder—it is a separate criminal offense. (See § 32; cf. *People v. Valentine* (2006) 143 Cal.App.4th 1383, 1388 [49 Cal.Rptr.3d 948] ["the offense of receiving stolen property is not a *defense* to robbery; rather, it is a theory of criminal liability based on a different offense"].) A defendant can be convicted of both murder and being an accessory to murder if the defendant aids the principal both before and during, as well as after, the murder is committed. (E.g., *People v. Riley* (1993) 20 Cal.App.4th 1808, 1815 [25 Cal.Rptr.2d 676] ["The conviction of accessory is based on defendant's act, the following day, of attempting to dispose of the gun."]; *People v. Mouton* (1993) 15 Cal.App.4th 1313, 1324–1325 [19 Cal.Rptr.2d 423] ["defendant's responsibility both as an accomplice to the murder and for the separate and distinct crime of acting as an accessory to a felony was neither logically inconsistent nor legally

prohibited," because "in substance he was convicted for two different sets of actions"]; see also *People v. Wallin* (1948) 32 Cal.2d 803, 806–807 [197 P.2d 734] [actual killer also could be liable as accessory on theory that, after completion of the murder, she encouraged another to help her avoid arrest].)

> (b) *Instruction pursuant to CALJIC No. 3.41 concerning concurrent causation, and failure to instruct pursuant to CALJIC No. 3.40 concerning "but for" causation*

Defendant argues that the trial court failed to instruct the jury properly concerning causation, and that this failure requires reversal. Defendant further contends the jury instructions concerning causation violated his rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. We conclude this claim is without merit. As demonstrated below, the instructions given in this case correctly stated the law pertaining to causation, were responsive to the evidence, and fully equipped the jury to address the issues presented.

Over defense objection, the trial court instructed the jury concerning concurrent causation pursuant to CALJIC No. 3.41, as follows: "There may be more than one cause of the death. When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death. [¶] If you find that the defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person contributed to the death."

Defendant argues this instruction incorrectly stated the law concerning causation because it informed the jury that if the torture that defendant committed merely was "operative at the moment of" Arthur's death, he was guilty of first degree murder even if the torture did not cause the death. The challenged instruction, however, "is not reasonably susceptible to defendant's interpretation." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1221–1222, fn. 11 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) CALJIC No. 3.41 informed the jury (1) that "[t]here may be more than one cause of the death," (2) that "[w]hen the conduct of two or more persons contributes concurrently as the cause of the death, the conduct of each is a [proximate] cause of the death *if that conduct was also a substantial factor contributing to the result*" (italics added), and (3) that a "cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." This instruction did not allow the jury to convict defendant of first degree murder solely on the basis that the torture committed by defendant was "operative at the

moment of" Arthur's death. Rather, it required the jury to find that the torture committed by defendant also was a "substantial factor contributing to" Arthur's death. Accordingly, there is "no reasonable likelihood" that the jury understood the instruction in the manner asserted by defendant. (*People v. Cain* (1995) 10 Cal.4th 1, 36 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; see *People v. Clair* (1992) 2 Cal.4th 629, 662–663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

Moreover, instructing the jury pursuant to CALJIC No. 3.41 was responsive to the evidence and to the arguments made at trial. A concurrent-cause instruction is required when the evidence places at issue two or more causes of the result of the crime. (*People v. Bland* (2002) 28 Cal.4th 313, 338 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*) [trial court should have given an instruction such as CALJIC No. 3.41, because the evidence suggested more than one cause of the harm].) As discussed above, the facts established that both defendant and Michelle personally engaged in, as well as aided and abetted, conduct that substantially contributed to Arthur's death. Thus, as we have explained, there was sufficient evidence from which the jury could have found, as the prosecutor expressly argued, that defendant's acts of torture were a concurrent cause of Arthur's death.

Defendant alternatively contends that the trial court should have amplified its concurrent causation instruction by defining "operative" and "substantial factor" as those words are used in CALJIC No. 3.41. We disagree. "When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) It is only when a word or phrase has a "technical, legal meaning" that differs from its "nonlegal meaning" that the trial court has a duty to clarify it for the jury. (*Ibid.*) Defendant proffers no technical, legal definition for the words "operative" and "substantial factor," nor does he cite any authority for the proposition that those terms carry a meaning that differs from their nonlegal meaning. We agree with the People that these words have no special meaning in CALJIC No. 3.41 beyond the common meaning of the terms themselves. (Compare *Bland, supra,* 28 Cal.4th at p. 335 ["proximate cause" has a meaning peculiar to the law that a jury would have difficulty understanding without guidance] with *Estrada, supra,* 11 Cal.4th at p. 578 ["reckless indifference to human life" does not have a technical meaning peculiar to the law], *People v. Raley, supra,* 2 Cal.4th at p. 901 [there is no special legal definition of "sadistic purpose"] and *People v. Richie* (1994) 28 Cal.App.4th 1347, 1360 [34 Cal.Rptr.2d 200] ["willful" and "wanton" are not technical terms with a particular legal meaning].) The trial court therefore had no duty to give, on its own motion, instructional definitions for "operative" and "substantial factor."

Finally, defendant argues the trial court should have instructed the jury pursuant to CALJIC No. 3.40 concerning "but for" causation, in order to provide the jurors with "more accurate information" about the decision they had to make. CALJIC No. 3.40 provides in relevant part as follows: "[To constitute the crime of _____ there must be in addition to the (result of the crime) an unlawful [act] [or] [omission] *which was a cause* of that _____ (result of the crime).] [¶] The criminal law has its own particular way of defining cause. A cause of the (result of the crime) _____ is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the _____ (result of the crime) and without which the _____ (result of the crime) would not occur."[20] (Italics added.)

We note that the jury was instructed pursuant to CALJIC No. 8.55, as follows: "To constitute murder or manslaughter there must be, in addition to the death of a human being, an unlawful act *which was a cause of that death*."[21] (Italics added.) This instruction is substantively identical to the first sentence of CALJIC No. 3.40.

To the extent defendant argues that the jury additionally should have been instructed pursuant to the second sentence in CALJIC No. 3.40, the failure to request this instruction on causation forfeited any claimed error. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].) This principle is demonstrated aptly by *People v. Alvarez* (1996) 14 Cal.4th 155 [58 Cal.Rptr.2d 385, 926 P.2d 365], a homicide case in which the defendant contended the trial court should have clarified its instruction defining murder,

---

[20] Defendant additionally claims that CALJIC No. 3.40 should have been modified pursuant to *People v. Cervantes* (2001) 26 Cal.4th 860 [111 Cal.Rptr.2d 148, 29 P.3d 225], in order to instruct the jury with the "precise legal principles" describing the link between defendant's act(s) and Arthur's death that was required in order to find defendant guilty of the homicide. We previously have held, however, that CALJIC 3.40 correctly defines proximate causation. (*Bland, supra*, 28 Cal.4th at p. 338.) Therefore, this component of defendant's claim also lacks merit.

[21] The jury also was instructed pursuant to CALJIC No. 8.58, concerning unlawfully accelerating death, as follows: "If a person unlawfully inflicts a physical injury upon another person and that injury is a cause of the latter's death, that conduct constitutes an unlawful homicide even though the injury inflicted was not the only cause of the death. Moreover, that conduct constitutes unlawful homicide, even if: [¶] 1. The person injured had been already weakened by disease, injury, physical condition or other cause; or [¶] 2. It is probable that a person in sound physical condition injured in the same way would not have died from the injury; or [¶] 3. It is probable that the injury only hastened the death of the injured person; or [¶] 4. The injured person would have died soon thereafter from another cause or other causes."

by referring to and explaining proximate cause. We concluded: "Had [defendant] desired such an amplification, he should have requested it of the superior court. He made no request of this sort. . . . Because defendant did not request amplification of the otherwise adequate instructions below, he may not complain here. [Citation.]" (*Id.* at p. 222, fn. omitted.) As demonstrated above, the instructions on causation that were given were legally correct and responsive to the evidence and counsel's arguments. The burden thus was upon defendant to request a clarifying or amplifying instruction concerning causation.[22]

 Defendant contends the trial court had a duty to instruct the jury on its own motion pursuant to the second sentence of CALJIC No. 3.40, as a general principle of law relevant to the issues raised by the evidence in this case. We disagree. The sentence instructs that a cause of death is an act that sets in motion a chain of events that produces death as a natural and probable consequence of the act, and without which death would not occur. (CALJIC No. 3.40.) This instruction is required in cases in which one cause of death is alleged but the evidence suggests that an independent supervening act, separate from the defendant's act, may have brought about the death. (*People v. Pock* (1993) 19 Cal.App.4th 1263, 1276 [23 Cal.Rptr.2d 900].) In cases in which there may be concurrent causes of death, however, the substantial factor test embodied by CALJIC No. 3.41 provides the accurate standard, because it avoids the possibility of jury confusion and prevents each defendant from escaping responsibility when the conduct of one or more others would have been sufficient to produce the same result. (*Pock, supra,* 19 Cal.App.4th at p. 1276.) In *Pock,* for example, the Court of Appeal held that CALJIC No. 3.41 properly was given and that the trial court was not required to give CALJIC No. 3.40 when the causation issue was not whether an unforeseen supervening cause resulted in the victim's death, but rather whether defendant's participation in the underlying felony coupled with his

---

[22] The cases cited by defendant do not support his contention that CALJIC No. 3.41 is a proper instruction *only* when given in conjunction with CALJIC No 3.40. In *Bland, supra,* 28 Cal.4th at pages 334–335, for example, we held that the trial court had a duty to provide, on its own motion, a definitional instruction when using the term "proximate causation" in instructing the jury concerning sentence enhancements. In analyzing which proximate cause instruction should have been given, we concluded that CALJIC Nos. 3.40 and 3.41 both correctly define proximate causation and, because the evidence suggested more than one cause of death, the trial court should have given an instruction similar to CALJIC No. 3.41 along with an instruction such as CALJIC No. 3.40. (*Bland, supra,* 28 Cal.4th at pp. 335–338; see also *People v. Autry* (1995) 37 Cal.App.4th 351, 363 [43 Cal.Rptr.2d 135] [there was no merit to the claim that giving both CALJIC Nos. 3.40 and 3.41 in the same case improperly lessened the prosecution's burden of proof].) This in no way implies that a trial court instructing a jury pursuant to CALJIC No 3.41 always must give CALJIC No 3.40 as well.

shooting of the victim—whether fatal or not—operated as a substantial factor in bringing about the victim's death. (*Pock, supra,* 19 Cal.App.4th at p. 1276.)[23]

In the present case, the prosecution argued that the torture inflicted by defendant was an intentional, direct, substantial, and contributing cause of Arthur's death. Defendant's main defenses were that he lacked the specific intent to kill Arthur and that the drugs were the primary cause of death. The causation issue, therefore, was not whether the torture committed by defendant set in motion a chain of events that led to Arthur's death, or whether giving Arthur a fatal combination of pills was a natural and probable consequence of the torture. The causation issue was whether defendant's acts of torture, consisting of severe and chronic physical abuse coupled with deliberate and prolonged deprivation of nourishment, were a concurrent cause of Arthur's death along with the drugs. The evidence at trial thus necessitated instructing the jury pursuant to CALJIC No. 3.41, and did not prompt a duty to instruct on the court's own motion pursuant to CALJIC No. 3.40.

> (c) *Failure to instruct concerning the "defense" of accident pursuant to CALJIC No. 4.45, and concerning criminal negligence pursuant to CALJIC No. 3.36*

Defendant claims that the trial court committed reversible error by failing to instruct the jury pursuant to CALJIC No. 4.45, concerning the "complete defense" of accident, in violation his rights under the Fifth, Sixth, and Eighth Amendments of the United States Constitution.[24] He further asserts that CALJIC No. 3.36, defining criminal negligence, should have been given along with CALJIC No. 4.45.

---

[23] We similarly have observed that the equivalents of CALJIC No. 3.40 and CALJIC No. 3.41 in the civil context, BAJI Nos. 3.75 and 3.76, "are *alternative* instructions that should not jointly be given in a single lawsuit." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049 [1 Cal.Rptr.2d 913, 819 P.2d 872] [" 'but for' test contained in BAJI No. 3.75 should not be used when two 'causes concur to bring about an event' "; the " 'proper rule' " in concurrent independent cause situations is that " 'the defendant's conduct is a cause of the event, because it is a material element and a substantial factor in bringing it about,' " as instructed in BAJI No. 3.76]; see also *Maupin v. Widling* (1987) 192 Cal.App.3d 568, 575 [237 Cal.Rptr. 521] ["the jury may have faced more than the usual confusion over proximate cause because it was instructed to apply *both* the 'but for' and the 'substantial factor' tests"].)

[24] CALJIC No. 4.45 provides: "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show [no] [neither] [criminal intent [n]or purpose,] [nor] [[criminal] negligence,] [he] [she] does not thereby commit a crime." The related instruction on excusable homicide, CALJIC No. 5.00, more specifically provides: "The unintentional killing of a human being is excusable and not unlawful when (1) committed by accident and misfortune in the performance of a lawful act by lawful means and (2) where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances."

As the People observe, the trial court *did* instruct the jury concerning criminal negligence, pursuant to CALJIC No. 3.36.[25] The court also instructed the jury concerning involuntary manslaughter, pursuant to CALJIC No. 8.45.[26] Therefore, contrary to defendant's claim, the jury in essence was instructed that if it concluded Arthur's death was the product of gross or criminal negligence, a culpable homicide occurred—but that such homicide would constitute involuntary manslaughter.

■■■ With respect to CALJIC No. 4.45, although acknowledging that he did not request this instruction, defendant contends the trial court had a duty to instruct on its own motion concerning accident as an "affirmative defense." (See *People v. Breverman, supra*, 19 Cal.4th at p. 157 [discussing the limited duty of a trial court to instruct on its motion concerning defenses].) A claim of accident in response to a charge of murder, however, is not an affirmative defense that can trigger a duty to instruct on the court's own motion.

Generally, the claim that a homicide was committed through misfortune or by accident "amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime." (*People v. Lara* (1996) 44 Cal.App.4th 102, 110 [51 Cal.Rptr.2d 402].) In *People v. Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588] (*Saille*), we held that evidence "proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt" may, but only upon request, justify the giving of a pinpoint instruction that "does not

---

[25] The jury was instructed concerning criminal negligence pursuant to CALJIC No. 3.36, as follows: "Criminal negligence means conduct which is more than ordinary negligence. Ordinary negligence is the failure to exercise ordinary or reasonable care. [¶] Criminal negligence refers to negligent acts which are aggravated, reckless or flagrant and which are such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life or to constitute indifference to the consequences of those acts. The facts must be such that the consequences of the negligent acts could reasonably have been foreseen, and it must appear that the death was not the result of inattention, mistaken judgment or misadventure but the natural and probable result of an aggravated, reckless or flagrantly negligent act."

[26] The jury was instructed concerning involuntary manslaughter, pursuant to CALJIC No. 8.45, as follows: "Every person who unlawfully kills a human being without malice aforethought and without an intent to kill is guilty of the crime of involuntary manslaughter . . . . [¶] A killing is unlawful within the meaning of this instruction if it occurred: [¶] 1. During the commission of an unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission; or, [¶] 2. In the commission of an act ordinarily lawful which involves a high degree of risk of death or great bodily harm without due caution and circumspection. [¶] An unlawful act not amounting to a felony consists of a violation of corporal injury to a child, Penal Code Section 273(d). [¶] The commission of an unlawful act without due caution and circumspection would necessarily be an act that was dangerous to human life in its commission. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; and, 2. The killing was unlawful."

involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Id.* at p. 1120.) "Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*Id.* at p. 1119.)

In the present case, the claim that Arthur was killed by accident through an overdose of sleeping pills amounts to a claim that defendant and Michelle lacked the intent to kill necessary for first degree premeditated murder and the torture-murder and murder-by-poison special circumstances. As such, instructing the jury pursuant to CALJIC No. 4.45 would have constituted a pinpoint instruction highlighting a defense theory that attempted to raise a doubt concerning an element (intent) of a crime that the prosecution must prove beyond a reasonable doubt. The burden therefore was upon defendant to request that the jury be instructed pursuant to CALJIC No. 4.45, and his failure to do so forfeited any claim of error in this regard. (See, e.g., *Gutierrez, supra,* 45 Cal.4th at p. 824 [the court has no duty to give a pinpoint instruction on its own motion concerning third party culpability to support a defense theory that such a party committed the murder]; *Saille, supra,* 54 Cal.3d at p. 1120 [the court has no duty to give, on its own motion, a voluntary-intoxication instruction relating the evidence of the defendant's intoxication to an element of a crime, such as premeditation and deliberation].)

### (d) *Omission of the actus reus element, for torture-murder special circumstance, from CALJIC No. 8.81.18*

Defendant claims we must set aside the torture-murder special-circumstance finding, because the trial court erred by deleting certain language from CALJIC No. 8.81.18, thereby omitting the requirement that the jury find that defendant did in fact inflict an act of torture upon Arthur. Although the modification was agreed to by counsel and was recommended by the Use Note to the instruction, it had the effect of eliminating an element of the special circumstance. This omission, however, did not prejudice defendant.

The trial court instructed the jury concerning the elements of the special circumstance of murder involving the infliction of torture, pursuant to a revised version of CALJIC No. 8.81.18, as follows: "To find that the special circumstance referred to in these instructions as murder involving infliction of torture is true, each of the following facts must be proved: [¶] 1. The murder was intentional; and [¶] 2. The defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of

persuasion, or for any sadistic purpose. [¶] Awareness of pain by the deceased is not a necessary element of torture." Purposefully deleted from standard CALJIC No. 8.81.18 was element No. 3 regarding proof of an act of torture, namely, the requirement that "[t]he defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration."[27]

This omission is directly attributable to the Use Note accompanying CALJIC 8.81.18, which states: "Torture murders committed on or before June 5, 1990 will require proof and instruction on element number 3. However, for crimes committed after that date, delete element number 3." The Use Note, in turn, appears to reflect a misunderstanding of the effect of Proposition 115, passed by the voters on June 5, 1990, upon the torture-murder special-circumstance statute.

The applicable statute provides that the special circumstance applies if "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) Prior to June 6, 1990, the statute further required "proof of the infliction of extreme physical pain no matter how long its duration." Proposition 115, however, eliminated this language. Thus, for all homicides committed after June 6, 1990, there is no requirement under the torture-murder special circumstance *that the victim actually suffer pain.* (See *People v. Crittenden* (1994) 9 Cal.4th 83, 140 & fn. 14 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Proposition 115 had no effect, however, upon the basic actus reus required for the special circumstance—that the murder *involve the infliction of torture.*[28]

■ Although the trial court erred in deleting the actus reus requirement from the torture-murder special-circumstance instruction that it gave to the jury, we conclude the omission was harmless beyond a reasonable doubt. (See

---

[27] Defense counsel acquiesced in the trial court's deletion of element number three from CALJIC No. 8.81.18. Because the alleged instructional error involves the omission of an element of the special circumstance, however, an objection or request for clarification is not a prerequisite to preserving the issue on appeal. (*Catlin, supra,* 26 Cal.4th at p. 149.)

[28] This change in the law is accurately reflected in the CALCRIM instruction concerning the torture-murder special circumstance, CALCRIM No. 733, which provides in relevant part: "To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intended to kill _____ *<insert name of decedent>*; [¶] 2. The defendant also intended to inflict extreme physical pain and suffering on _____ *<insert name of decedent>* while that person was still alive; [¶] 3. The defendant intended to inflict such pain and suffering on _____ *<insert name of decedent>* for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; [¶] AND [¶] *<Alternative A—on or after June 6, 1990>* [4. The defendant did an act involving the infliction of extreme physical pain and suffering on _____ *<insert name of decedent>*.] [¶] *<Alternative B—before June 6, 1990>* [4. The defendant in fact inflicted extreme physical pain on _____ *<insert name of decedent>*.] [¶] There is no requirement that the person killed be aware of the pain."

*People v. Bolden* (2002) 29 Cal.4th 515, 560 [127 Cal.Rptr.2d 802, 58 P.3d 931] [failure to instruct on an essential element of a special circumstance is subject to a harmless error analysis under *Chapman, supra*, 386 U.S. 18].) In light of defendant's admissions, the arguments of counsel, the totality of the jury instructions, and the overwhelming evidence on this point, there simply is no possibility that the jury's special circumstance finding was based on a mere *intent* to torture unrealized by an *act* of torture.

"When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803–804 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) In the present case, the totality of the jury instructions clearly communicated that in order to find the torture-murder special circumstance true, the jury had to find that the murder involved an act or acts of torture. For example, the jury was instructed that the information alleged that the "murder was intentional and involved *the infliction of torture* within the meaning of Penal Code section 190.2, [subdivision] (a), subparagraph (18)." (Italics added.) In an introductory instruction pertaining to the special circumstances, the trial court stated: "If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following circumstances are true or not true. And the special circumstances are, one, that the defendant intentionally killed the victim by the administration of poison, and then the other is the murder was intentional and involved the infliction of torture." The written version of CALJIC No. 8.81.18 given to the jury included a caption, "Special Circumstances— Murder Involving: Infliction of Torture." The instructions concerning first degree murder by torture and the crime of torture further confirmed an actus reus requirement. Pursuant to CALJIC No. 8.24, the jury was instructed that in order to find murder by torture, it had to find, among other things, "acts or actions taken by the perpetrator to inflict extreme and prolonged pain." Pursuant to CALJIC No. 9.90, the jury was instructed that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of persuasion, or for any sadistic purpose, inflicts great bodily injury on the person of another is guilty of the crime of torture." No reasonable juror could have misunderstood these instructions to mean that a murder involving the infliction of torture could lack an act or acts of torture.

Removing an element of the crime from the jury's consideration also will be deemed harmless when the defendant concedes or admits that element. (*People v. Flood* (1998) 18 Cal.4th 470, 504 [76 Cal.Rptr.2d 180, 957 P.2d 869].) In the joint interview with the detectives, defendant admitted having inflicted serious physical injuries upon Arthur on several occasions. At trial, defense counsel did not attempt to argue to the jury that Arthur had not been

tortured and, in fact, in closing arguments candidly told the jury that defendant was responsible for "horrible," "awful," "terrible, terrible child abuse." Rather, defendant defended against the torture-murder special circumstance solely upon the basis that defendant did not intend to kill Arthur and that the torture was not a concurrent cause of Arthur's death. Nor does defendant suggest there existed any favorable evidence bearing upon the actus reus issue that possibly could have resulted in a different outcome on the torture-murder special-circumstance allegation. (See, e.g., *Neder v. United States* (1999) 527 U.S. 1, 15 [144 L.Ed.2d 35, 119 S.Ct. 1827] [omission of the element of "materiality" did not warrant reversal where defendant did not contest materiality at trial and did not suggest he would introduce any evidence bearing upon the issue of materiality on retrial].) The record, moreover, is replete with evidence of defendant's acts of torture, which included deliberately starving Arthur to the point of emaciation at the same time as severely physically abusing him and inflicting numerous painful injuries in the less-than-three-month period that culminated in Arthur's death.

Finally, at no time was it suggested to the jury that the torture-murder special circumstance could be established without first proving an act of torture. To the contrary, the prosecutor's closing argument confirmed that the torture-murder special circumstance required the infliction of an act or acts of torture: "If you find a first degree murder, and only if you find a first degree murder, then you look to the two special circumstances, and that's that the murder was intentional and done with either poison or *involved torture*. And I say involved torture. It doesn't imply torturous acts killed the child but they are a cause. . . . To find a special circumstance true, you have to find there was an intent to kill coupled with the poison or coupled with the torture. That's the difference." (See *People v. Wade* (1988) 44 Cal.3d 975, 994 [244 Cal.Rptr. 905, 750 P.2d 794] [the jury was not misled by omission of the intent-to-torture element in the torture-murder special-circumstance instruction, in part because the prosecution specifically explained to the jury that the special circumstance required an intent to kill].)

In light of these circumstances, we are satisfied beyond a reasonable doubt that the trial court's error in omitting the actus reus requirement from the torture-murder special-circumstance instruction did not contribute to the jury's true finding on this issue. (*People v. Mayfield, supra,* 14 Cal.4th at p. 774 [" 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]"].)

(e) *Failure to give unanimity instruction for torture-murder special circumstance*

Defendant claims the trial court failed to instruct the jury that it had to find unanimously beyond a reasonable doubt that defendant committed a particular act or acts of torture with the requisite intent, in order to find the torture-murder special circumstance true, and that this failure violated his federal constitutional right to a jury trial on each element of the charge.[29] In support of this argument, defendant invokes *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) This claim is without merit.

■ As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971].) There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises "when the acts are so closely connected in time as to form part of one transaction" (*People v. Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423]), or "when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time" (*People v. Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516]). There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. (*People v. Carrera* (1989) 49 Cal.3d 291, 311–312 [261 Cal.Rptr. 348, 777 P.2d 121].)

---

[29] Defendant does not identify the unanimity instruction that he asserts should have been given. CALJIC No. 17.01, the standard CALJIC unanimity instruction, provides in relevant part: "The defendant is accused of having committed the crime of ____ [in Count ____]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] . . . upon which a conviction [on Count ____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] . . . committed any one or more of the [acts] . . . . However, in order to return a verdict of guilty [to Count ____], all jurors must agree that [he] . . . committed the same [act] [or] . . . [acts] . . . . It is not necessary that the particular [act] . . . agreed upon be stated in your verdict."

Even if we were to assume, without deciding, that the unanimity requirement applies to special circumstance findings,[30] the trial court still would not have been required to give a unanimity instruction in the present case. The prosecutor proceeded on a "course of conduct" theory, arguing that the cumulative effect of the torture that began in November 1995 and continued until Arthur finally died in February 1996 was a concurrent cause of death. (See, e.g., *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429 [89 Cal.Rptr.3d 402] ["Where (as here) torture is charged and tried as a course of conduct crime, no single act in the perpetrator's course of conduct may result in great bodily injury. But where the cumulative result of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed under the course of conduct exception to the election/unanimity requirement."].) In response, defendant consistently argued that he lacked the specific intent to kill Arthur and that the drugs were the primary cause of death. Therefore, the course-of-conduct exception to the unanimity requirement would apply, as would the same-defense exception noted above. Accordingly, defendant's claim of error fails.

### 5. *Jury's mid-deliberation question regarding torture*

Defendant claims he was denied his constitutional and statutory right to be present while the court and counsel discussed how to respond to the jury's guilt-phase question as to whether starvation could "be construed as extreme physical pain under the legal definition of torture." As discussed below, because defendant had no right to be present during these informal discussions, we conclude this claim is without merit. Defendant further argues that the court substantively erred in responding to the jury's question. We conclude defendant waived this claim by consenting to the response given by the court to the inquiry. Even if the claim were not waived, we would conclude it lacks merit.

### (a) *Factual background*

After the jury had been deliberating for several days, it sent the following question to the court: "Can starvation be construed as extreme physical pain

---

[30] We previously have assumed, without deciding, that the unanimity requirement applies to special circumstance findings. (See, e.g., *People v. Davis* (2005) 36 Cal.4th 510, 563 [31 Cal.Rptr.3d 96, 115 P.3d 417] [finding harmless beyond a reasonable doubt any possible error in failing to instruct that the jury must agree unanimously upon a theory of robbery with respect to the robbery-murder special circumstance]; *People v. Sapp* (2003) 31 Cal.4th 240, 283–285 [2 Cal.Rptr.3d 554, 73 P.3d 433] [rejecting, on the particular facts, a claim that the trial court was required to give a unanimity instruction as to the financial-gain special circumstance]; *People v. Mickle* (1991) 54 Cal.3d 140, 178 [284 Cal.Rptr. 511, 814 P.2d 290] [rejecting claim that unanimity instruction given on lewd and lascivious act special circumstance allegation did not result in a valid unanimous verdict].)

under [the] legal definition of torture?" The court and counsel discussed the matter in chambers outside the presence of the two defendants. Subsequently, in open court with defendants present, the court read the response to which counsel and the court had agreed: "Only if the required mental state for the lesser offense of torture or the Special Circumstance—Murder Involving Infliction of Torture is proved, see California Jury Instruction 9.90 and 8.81.18, then it is up to the jury and each of you to decide whether or not starvation may constitute extreme physical pain under the law." All counsel confirmed that the response was acceptable. The court then had the response typed and given to the jury.

Approximately one hour after the court sent its answer to the jury, the jury alerted the court that it was unable to reach a verdict concerning the torture-murder special circumstance with respect to Michelle. The jury then returned its verdicts on the substantive crimes and the remaining special circumstance allegations, including a true finding on the torture-murder special circumstance with respect to defendant.

### (b) *Analysis*

 Defendant contends he was denied his constitutional and statutory right to be present while the court and counsel discussed in chambers how to respond to the jury's question. "Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043. [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1230 [17 Cal.Rptr.3d 532, 95 P.3d 811] (*Cole*); see, e.g., *United States v. Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 105 S.Ct. 1482]; *People v. Lucero* (2000) 23 Cal.4th 692, 716 [97 Cal.Rptr.2d 871, 3 P.3d 248] (*Lucero*); *People v. Jones* (1991) 53 Cal.3d 1115, 1140–1141 [282 Cal.Rptr. 465, 811 P.2d 757].) " 'A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.]' " (*Lucero, supra*, 23 Cal.4th at p. 717.)

 For example, under the Sixth Amendment, a criminal defendant has the right to be personally present if his or her appearance is necessary to prevent interference with the defendant's opportunity for effective cross-examination. (*Kentucky v. Stincer* (1987) 482 U.S. 730, 740, 744, fn. 17 [96 L.Ed.2d 631, 107 S.Ct. 2658]; *People v. Waidla* (2000) 22 Cal.4th 690, 741 [94 Cal.Rptr.2d 396, 996 P.2d 46] (*Waidla*).) The right to be present arises under the Fourteenth Amendment if the defendant finds himself or herself at a "stage . . . that is critical to [the] outcome" and the defendant's

"presence would contribute to the fairness of the procedure." (*Stincer, supra,* 482 U.S. at p. 745; see *Waidla, supra,* 22 Cal.4th at p. 742, quoting *Stincer.*)

Similarly, under the California Constitution, a defendant has no right to be present at discussions that occur outside the jury's presence, whether in chambers or at the bench, concerning questions of law or other matters that do not bear " ' "a ' " 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' " ' " ' " (*Cole, supra,* 33 Cal.4th at p. 1231.) "Thus a defendant may ordinarily be excluded from conferences on questions of law, *even if those questions are critical to the outcome of the case,* because the defendant's presence would not contribute to the fairness of the proceeding. Examples include the exclusion of a defendant from a conference on the competency of child witnesses [citation], a conference on whether to remove a juror [citation], and a conference on jury instructions [citation]." (*People v. Perry* (2006) 38 Cal.4th 302, 312 [42 Cal.Rptr.3d 30, 132 P.3d 235], italics added.) Additionally, a defendant's statutory right pursuant to sections 977[31] and 1043[32] to be personally present during certain proceedings does not apply to such conferences, even absent a waiver, where the defendant has no such right under the California Constitution. (*Cole, supra,* 33 Cal.4th at p. 1231; *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Finally, the burden is on the defendant to demonstrate that his or her absence prejudiced the defense or denied the defendant a fair trial. (*Lucero, supra,* 23 Cal.4th at p. 716; *Bradford, supra,* 15 Cal.4th at p. 1357.)

With these principles in mind, we conclude that defendant did not have a constitutional or statutory right to be personally present during the in-chambers discussion regarding how to respond to the jury's question concerning whether "starvation [can] be construed as extreme physical pain under [the] *legal definition* of torture." (Italics added.) The formulation of an appropriate response to this question was a legal matter, and, as noted, a defendant does not have the right to be personally present during proceedings, held in-chambers and outside of the jury's presence, concerning questions of law. (*Waidla, supra,* 22 Cal.4th at p. 742.)

*Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906, cited by defendant in support of his claim, is inapposite. There, the United States Court of Appeals for the

---

[31] Section 977, subdivision (b)(1), provides in pertinent part: "In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ."

[32] Section 1043, subdivision (a), provides: "Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial."

Ninth Circuit granted a habeas corpus petition because neither the defendant *nor* his counsel was present when the trial court responded to a jury request for a readback of testimony. (*Id.* at p. 912; accord, *Shields v. United States* (1927) 273 U.S. 583, 584–585, 588–589 [71 L.Ed. 787, 47 S.Ct. 478] [defendant's right to be present was violated when court responded to a jury question ex parte without defendant or counsel present].) In contrast, in the present case, defense counsel participated in the in-chambers discussion and was fully in a position to represent defendant's interests.

We additionally note that defendant's right to be present during the discussion regarding the jury's question never was affirmatively asserted, nor was any objection posed to his absence. "[T]he fact that counsel did not think defendant['s] presence was necessary strongly indicates that [his] presence did not, in fact, bear . . . a substantial relation" to the fullness of his opportunity to defend. (*People v. Cleveland* (2004) 32 Cal.4th 704, 741 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Moreover, before any response was provided to the jury, the jury's question and the proposed response were read in open court with defendant present, thus affording defendant ample opportunity to raise any issue or concern. (See *Cole, supra,* 33 Cal.4th at p. 1232 ["when defendant arrived during the in-court hearing, the court summarized that it was currently hearing a defense continuance motion" and "[p]resumably defendant could have given the court or counsel any information he had at that time"].)

Defendant also claims the trial court's response to the jury's question was erroneous, because *starvation cannot constitute torture* under section 190.2, subdivision (a)(18), as a matter of law and even if it could, the court should have instructed the jury that the prosecution had to prove beyond a reasonable doubt that the acts of starvation were capable of causing extreme physical pain. Any claim of error with respect to the trial court's response to the jury's question has been waived, however, because defense counsel both participated in the formulation of a response and affirmatively approved of the response ultimately given. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [36 Cal.Rptr.2d 235, 885 P.2d 1] [claim of error waived when defendant both suggested and consented to the responses given by the court to the jury's questions]; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373 [100 Cal.Rptr.2d 845] [same].) Even if the claim were not waived, we would conclude it is without merit.

 First, defendant argues that starvation cannot constitute torture as a matter of law, because it involves the passive withholding of nourishment instead of the affirmative infliction of external injury. In support of this argument, defendant quotes from *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1564 [18 Cal.Rptr.2d 395] (*Barrera*), which stated: "Torture combines

a specific state of mind *with a particular type of violent conduct* causing significant personal injury." (Italics added.) The issue of whether torture requires violent conduct inflicting external injury, however, never was raised or considered in *Barrera*.[33] "It is axiomatic that cases are not authority for propositions not considered." (*People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].) "The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning." (*McGee v. Superior Court* (1985) 176 Cal.App.3d 221, 226 [221 Cal.Rptr. 421].) In light of the failure of the *Barrera* opinion to discuss the issue, it is doubtful that the court in that case intended to strictly require "a particular type of violent conduct" for the crime of torture, let alone for torture murder or the torture-murder special circumstance. Nor has *Barrera* ever been cited in a published opinion for this proposition.

By contrast, the argument now made by defendant was considered and rejected in *People v. Lewis* (2004) 120 Cal.App.4th 882, 887–888 [16 Cal.Rptr.3d 498] in an analogous context. In that case, the People argued that "battery is not a lesser included offense of torture because torture can be committed without touching, force, or violence, which are required elements of battery. For example, torture exists not only where there is direct infliction of injury, but also where injury results from enforced deprivation, *such as withholding food and water, causing starvation.*" (*Id.* at p. 887, italics added.) The court agreed: "The statutory definition of torture does not require a direct use of touching, physical force, or violence, but instead is satisfied if the defendant, directly or indirectly, inflicts great bodily injury on the victim. Thus a defendant may commit torture *without necessarily committing a battery.*" (*Id.* at p. 888, italics added.)

Second, defendant asserts that the act of starvation cannot constitute torture as a matter of law, because it is incapable of causing extreme physical pain.[34]

---

[33] Rather, the issue addressed by the court in *Barrera* was whether section 206, defining the crime of torture, was vague and overbroad. (*Barrera, supra*, 14 Cal.App.4th at pp. 1562–1564.) In rejecting this challenge, the Court of Appeal concluded that section 206 embodied the long-standing, judicially recognized meaning of torture set forth in *People v. Tubby* (1949) 34 Cal.2d 72 [207 P.2d 51]: "Torture has been defined as the 'Act or process of inflicting severe pain, esp. as a punishment in order to extort a confession, or in revenge.' [Citation.] . . . 'Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering, the victim dies. That intent may be manifested by the nature of the acts and circumstances surrounding the homicide.' [Citation.]" (*Id.* at pp. 76–77.)

[34] In support of the argument that starvation is incapable of causing extreme physical pain, defendant refers to certain medical research, accounts of wilderness survival, accounts of war survival, and recorded observations of individuals involved in hunger strikes. The studies and

To the contrary, we believe the court and counsel properly concluded that whether the starvation in this case constituted torture was not a legal determination to be made by the court, but instead was a question of fact for the jury to decide. The jurors were entitled to evaluate the evidence presented at trial in the context of their general knowledge and experience to determine whether the prolonged and purposeful deprivation of food and other nourishment, resulting in Arthur's losing nearly half his body weight, was capable of causing extreme physical pain and suffering. The evidence moreover established that Arthur suffered significant physical injury as a result of the starvation—Dr. Sheridan testified that Arthur had almost no fat beneath his skin, that his body was breaking down his muscles for energy, and that he had acute pneumonia as a part of his overall failure to thrive and the breakdown in his immune system from severe emaciation. The jury, reasonably could conclude from this evidence that, for purposes of the torture-murder special circumstance, the starvation in this case involved the infliction of "extreme physical pain and suffering." (See also *ante,* at pp. 642–645, 647–648 [rejecting defendant's related claims that there was insufficient evidence to establish first degree murder by torture and the torture-murder special circumstance].) We further note that a torture victim need not have been subjectively aware of the pain inflicted by the torturous acts, so long as the defendant intended to cause such pain. (See *Chatman, supra,* 38 Cal.4th at p. 389; *Elliot, supra,* 37 Cal.4th at pp. 466–467.) Here, defendant essentially admitted that he intended the deliberate act of starving Arthur to be painful, because defendant was using starvation as a behavior-modification technique.

We further reject defendant's contention that the trial court was required, in its response to the jury's question, to instruct the jury that the prosecution had to prove beyond a reasonable doubt that the acts of starvation were capable of causing extreme physical pain. The jury properly was instructed concerning the prosecution's burden of proof pursuant to CALJIC No. 2.90 (Presumption of Innocence—Reasonable Doubt—Burden of Proof)[35] and CALJIC

anecdotal evidence that defendant cites, however, are not part of the record before us and were not offered into evidence. Nor are these materials embraced by both parties as accurate, or as something that we properly might judicially notice. Even assuming for purposes of argument that we could take judicial notice of the existence, content, and authenticity of these secondary materials, doing so would not establish the *truth* of critical factual matters asserted therein. (See, e.g., *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063–1064 [31 Cal.Rptr.2d 358, 875 P.2d 73] [" '[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom.' "].) In any event, in resolving this issue we confine ourselves to the record on appeal.

[35] The trial court instructed the jury pursuant to CALJIC No. 2.90, as follows: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to a

No. 8.80.1 (Special Circumstances—Introductory).[36] The trial court was not required to remind the jury of the prosecution's burden of proof in its response to the jury's question, and this is particularly so in the absence of such a request from defense counsel.

### B. *Penalty Phase Issues*

#### 1. *Intracase proportionality review*

Defendant argues that intracase proportionality review should result in the reversal or modification of his judgment of death. This court conducts intracase proportionality review to determine whether the penalty is disproportionate to the defendant's personal culpability. (E.g., *Riel, supra*, 22 Cal.4th at p. 1223.) "To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388].) The disposition that a codefendant received, however, is not a factor to be considered in that review. (*Riel, supra*, 22 Cal.4th at p. 1223.) "If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*Hines, supra*, 15 Cal.4th at p. 1078.)

Defendant's sentence of death in this case is not disproportionate to his personal culpability in light of the evidence that defendant intended to kill Arthur and that the torture inflicted by defendant on his five-year-old son—violently abusing the child and systematically starving him to the point of emaciation—was a concurrent cause of Arthur's death. The evidence refutes defendant's contention that the death sentence is disproportionate.

---

verdict of not guilty. This presumption places upon the People the burden of proving him or her guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

[36] The trial court instructed the jury pursuant to CALJIC No. 8.80.1, in pertinent part, as follows: "The People have the burden of proving the truth of the special circumstances. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true."

## 2. *Reduction of sentence*

 Defendant argues that, under the authority of section 1181, subdivision 7,[37] we should reduce his sentence to one of life imprisonment without the possibility of parole. As we previously have held, however, section 1181 does not confer upon this court the power to substitute its judgment as to choice of penalty for that of the trier of fact. We thus may not reduce a capital defendant's sentence from death to life imprisonment, unless that sentence is contrary to the law or to the evidence, even if we were to disagree with the jury's penalty determination. (E.g., *People v. Hines, supra,* 15 Cal.4th at pp. 1078–1080.) Rather, "[a]bsent prejudicial error or legal insufficiency of evidence, this court must uphold the jury's verdict of death." (*Id.* at p. 1080.)

## 3. *Challenges to California's death penalty scheme*

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme, based upon the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. As defendant acknowledges, we have considered and rejected these contentions in prior cases. Defendant presents no persuasive reason in the present case to reconsider the conclusions we previously reached. We therefore adhere to those decisions as follows.

Capital punishment is not per se unconstitutional in all cases. (E.g., *People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*).) Nor does the death penalty constitute cruel and unusual punishment in violation of the Eighth Amendment. (E.g., *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321] (*Fairbank*).)

Defendant contends that the *Hovey* voir dire procedure (*Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]), by which prospective jurors are asked individually about their views concerning the death penalty and may be excused if they would not vote to impose the death penalty under any circumstances, violated his rights under the state and federal Constitutions to a fair and impartial jury and to a jury reflecting a fair cross-section of the community. As a threshold matter, the People argue this

---

[37] Section 1181, subdivision 7, provides: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial . . . [¶] . . . [¶] . . . When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed . . . ."

claim has been forfeited by defendant's failure to make a timely and specific objection on this ground in the trial court.[38] We agree. (*Gurule, supra,* 28 Cal.4th at p. 597.) Even if we were to assume defendant had preserved this claim on appeal, it is without merit. (*People v. Mills* (2010) 48 Cal.4th 158, 171–173 [106 Cal.Rptr.3d 153, 226 P.3d 276] [rejecting the identical claim].) It is well established that the death qualification of a jury using the *Hovey* voir dire procedure, and the resulting excusal of prospective jurors for cause based upon their views concerning the death penalty, does not violate a defendant's right to a fair and impartial jury and to a jury reflecting a fair cross-section of the community. (See, e.g., *People v. Jackson, supra,* 13 Cal.4th at p. 1198 ["The exclusion of those categorically opposed to the death penalty at the guilt phase of the trial does not offend either the United States Constitution [citation] or the California Constitution [citation]."].)

Section 190.2 is not impermissibly overbroad in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Specifically, the various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly expansive, either on their face or as interpreted by this court. (E.g., *People v. Jenkins, supra,* 22 Cal.4th at p. 1050.) Nor did the 1978 death penalty law—enacted by the voters by way of initiative in November 1978—have the intended or practical effect of making all murderers death eligible. (E.g., *People v. Gray* (2005) 37 Cal.4th 168, 237, fn. 23 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

Section 190.3, factor (a), does not, on its face or as interpreted and applied, permit arbitrary and capricious imposition of a sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. (E.g., *People v. Brasure* (2008) 42 Cal.4th 1037, 1066 [71 Cal.Rptr.3d 675, 175 P.3d 632]; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630] ["The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."].) "Defendant's argu-

---

[38] Anticipating we would find this claim forfeited, defendant contends it is still cognizable on appeal under the rubric of ineffective assistance of counsel based upon his attorney's failure to object. As noted, defendant may not transform a forfeited claim into a cognizable claim merely by asserting ineffective assistance of counsel. (*Riel, supra,* 22 Cal.4th at pp. 1202–1203 [noting that a claim of ineffective assistance of counsel is very different from a claim based upon the underlying forfeited error].) In any event, "[w]e need not address this contention because even assuming for argument the [*Hovey*] issue is properly before us, we find no error . . . ." (*People v. Gurule* (2002) 28 Cal.4th 557, 597 [123 Cal.Rptr.2d 345, 51 P.3d 224], fn. omitted (*Gurule*); see also *Kraft, supra,* 23 Cal.4th p. 1065 [because trial court properly declined to instruct on principles of aider-abettor and accessory liability, defendant's related claim of ineffective assistance of counsel also must fail].)

ment that a seemingly inconsistent range of circumstances can be culled from death penalty decisions proves too much. What this reflects is that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances." (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown*).)

Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors. (E.g., *Fairbank, supra,* 16 Cal.4th at p. 1255.) The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury-trial guarantee (see *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi, supra,* 530 U.S. 466) do not alter these conclusions. (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1249 & fn. 22 [96 Cal.Rptr.3d 574, 210 P.3d 1171].)

"The death penalty scheme is not unconstitutional because it fails to allocate the burden of proof—or establish a standard of proof—for finding the existence of an aggravating factor . . . . [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 89 [97 Cal.Rptr.3d 1, 211 P.3d 520].) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) We additionally reject defendant's alternative argument that even if it is permissible not to impose any burden of proof at the penalty phase of a capital trial, it nevertheless was prejudicial error for the trial court to fail to instruct the jury that neither party bears a burden of proof at that phase of the trial. "[E]xcept for prior violent crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof, or instruct the jury that there is no burden of proof at the penalty phase. [Citations.]" (*People v. Cruz, supra,* 44 Cal.4th at p. 681 (*Cruz*); see also *Tuilaepa v. California, supra,* 512 U.S. at p. 979 [jury "need not be instructed how to weigh any particular fact in the capital sentencing decision"].)

Written or other specific findings by the jury regarding the aggravating factors are not constitutionally required. (E.g., *People v. Friend, supra,* 47 Cal.4th at p. 90.)

The use of adjectives such as "extreme" in section 190.3, factors (d) and (g), or "substantial" in section 190.3, factor (g), do not serve as an improper barrier to the consideration of mitigating evidence. (E.g., *Cruz, supra*, 44 Cal.4th at p. 681.)

The trial court was not constitutionally required to instruct the jury as to which of the listed sentencing factors are aggravating, which are mitigating, and which could be either mitigating or aggravating, depending upon the jury's appraisal of the evidence. (E.g., *People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614]; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 509 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*) ["The aggravating or mitigating nature of the factors is self-evident within the context of each case."].) Additionally, "the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors amounted to aggravation. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 228 [79 Cal.Rptr.3d 125, 186 P.3d 496].) Rather, we repeatedly have held that "CALJIC No. 8.85 is both correct and adequate." (*People v. Valencia* (2008) 43 Cal.4th 268, 309 [74 Cal.Rptr.3d 605, 180 P.3d 351].)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. (E.g., *Cruz, supra*, 44 Cal.4th at p. 681.)

We again reject the argument that California's death penalty scheme is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution. (*People v. Avila* (2009) 46 Cal.4th 680, 725 [94 Cal.Rptr.3d 699, 208 P.3d 634].) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*Hillhouse, supra*, 27 Cal.4th at p. 511.) Because we conclude that defendant's sentence was rendered in accordance with those requirements, we need not consider whether alleged violations of such requirements also would violate international law. (*Brown, supra*, 33 Cal.4th at pp. 403–404; *People v. Bolden, supra*, 29 Cal.4th at p. 567.) We also reject the argument that the use of capital punishment "as regular punishment" violates international norms of humanity and decency and hence violates the Eighth Amendment of the United States Constitution. "California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for

felonies. [Citations.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

Prosecutorial discretion in deciding whether to seek the death penalty in a particular case does not render the law unconstitutional. (*Kraft, supra*, 23 Cal.4th at p. 1078.)

There is no constitutional requirement that California's death penalty sentencing scheme provide for intercase proportionality review. (*Moon, supra*, 37 Cal.4th at p. 48; see also *Pulley v. Harris, supra*, 465 U.S. at pp. 50–51 [federal Constitution does not require state courts to conduct intercase proportionality review in the administration of the death penalty].)

Finally, we consistently have held that the delay between the time of judgment and the time of any execution that might occur does not render the death judgment unconstitutional. (E.g., *People v. Lenart* (2004) 32 Cal.4th 1107, 1131–1132 [12 Cal.Rptr.3d 592, 88 P.3d 498].) "The mere possibility defendant may someday no longer pose a threat to society is an insufficient reason for this court to revisit its prior holding that delay between sentencing and execution does not make a death sentence cruel and unusual." (*Ibid.*)

## C. *Asserted Substantial Cumulative Effect of Errors*

Defendant contends the substantial cumulative effect of the asserted guilt and penalty phase errors requires reversal of his conviction and death sentence, even if none of the errors individually is prejudicial. Contrary to defendant's contention, and as discussed above, this was not a close case concerning the issues of whether defendant caused the death of his son, or whether the homicide was a first degree murder or qualified for a special circumstance. We have found only a few nonprejudicial errors, and no prejudice where error has been assumed in other instances. In light of the extensive and overwhelming evidence of defendant's guilt and the aggravating circumstances of his crime, we conclude that there was no substantial error and that the cumulative effect of any possible errors does not warrant reversal of the judgment. Contrary to defendant's assertion, the length of the jury's deliberations during the guilt phase (seven days) and the penalty phase (three days), and the circumstance that the jury requested that the testimony of certain witnesses be read back to it during these deliberations, does not compel a different conclusion.

## III. DISPOSITION

For the forgoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.